# EXHIBIT A

# EXHIBIT A

LexisNexis                 5/3/2012 3:42 PM  PAGE   5/010   Fax Server
389893272

| Event Number: 12-06357 | STATE OF NEVADA TRAFFIC ACCIDENT REPORT VEHICLE INFORMATION SHEET *Revised 1/1/004* | Accident Number: |
|---|---|---|

| Vehicle # 0002 | # Occupants 1 | ☐ 1) At Fault ☒ 2) Non Contact Vehicle | Agency Name: HENDERSON POLICE DEPARTMENT |
|---|---|---|---|

**Direction of Travel:** ☒ 1) North  ☐ 2) South  ☐ 3) East  ☐ 4) West   **Travel Lane #:** 2T

**Highway / Street Name:** SEVEN HILLS DRIVE

**Vehicle:** ☐ 1) Straight  ☐ 3) Left Turn  ☐ 5) U-Turn  ☐ 7) U-Turn  ☐ 9) Passing  ☐ 11) Leaving Parked  ☐ 13) Lighting Lane  ☐ 15) Enter Parked  ☐ 17) Lane Change  ☐ 19) Unknown

**Action:** ☐ 2) Backing  ☐ 4) Right Turn  ☐ 6) Parked  ☐ 8) Stopped (?)  ☐ 10) Resting  ☐ 12) Starting Lane  ☐ 14) Other Turning  ☐ 16) Driverless Vehicle  ☐ 18) Other

| Driver: *(Last Name, First Name, Middle Name  Suffix)* | Transported By: ☒ 1) Not Transported  ☐ 2) EMS  ☐ 3) Police  ☐ 4) Unknown |
|---|---|
| LAMBERT, MARY JEAN | ☐ 4) Other |

| Street Address: 2981 PANORAMA RIDGE DR | Transported To: |
|---|---|

| City: HENDERSON | State / Country ☐ 1) NV NV | Zip Code: 89052 | Person Type: 1 | Seating Position: 01 | Occupant Restraints: 7 |
|---|---|---|---|---|---|

| ☐ 1) Male  ☐ 3) Unknown ☒ 2) Female | DOB: ▮▮▮ | Phone Number: (702) 810-▮▮▮ | Injury Severity: B | Injury Location: 07 |
|---|---|---|---|---|

| OLN: | State: ☐ 1) NV | Class: B | ☐ 1) CDL  ☐ 3) DL 00 | License Status: | Airbag: 03 | Airbag Switch: 04 | Ejected: 00 | Trapped: 00 |
|---|---|---|---|---|---|---|---|---|

| Compliance: ☐ 1) Restrain  ☐ 2) Endorse | Endorsements: | Restrictions: | **Driver Factors** |
|---|---|---|---|

**Alcohol/Drug Involvement:**
☒ 1) Not Involved
☐ 2) Suspected Impairment
☐ 3) Alcohol  ☐ 4) Drugs
☐ 0) Unknown

**Method of Determination** (check up to 2)
☐ 1) Field Sobriety Test  ☐ 4) Urine Test
☐ 2) Evidentiary Breath  ☐ 5) Blood Test
☐ 3) Driver Admission  ☐ 6) Preliminary Breath Test

Test Results: _____

**Driver Factors**
☒ 1) Apparently Normal
☐ 2) Had Been Drinking
☐ 3) Drug Involvement
☐ 4) Apparently Fatigued / Asleep
☐ 5) Obstructed View

☐ 6) Driver Ill / Injured
☐ 7) Other Improper Driving
☐ 8) Driver Inattention / Distracted _____
☐ 9) Physical Impairment _____
☐ 10) Unknown

| Vehicle Year: 2004 | Vehicle Make: HYUNDAI | Vehicle Model: TIBURON | Vehicle Type: 2H | **Vehicle Factors** |
|---|---|---|---|---|

**Vehicle Factors**
☐ 1) Failed To Yield Right Of Way
☐ 2) Disregard Control Device
☐ 3) Too Fast For Conditions
☐ 4) Exceeding Speed Limit
☐ 5) Wrong Way / Direction
☐ 6) Mechanical Defects _____
☐ 7) Drove Left Of Center
☐ 8) Other _____

☐ 9) Failed To Maintain Lane
☐ 10) Following Too Close
☐ 11) Unsafe Lane Change
☐ 12) Made Improper Turn
☐ 13) Over Correct/Steering
☐ 14) Other Improper Driving
☐ 15) Aggressive / Reckless / Careless

☐ 16) Driverless Vehicle
☐ 17) Vehicle Backing
☐ 18) Ran Off Road
☐ 19) Hit and Run
☐ 20) Road Defect (*) _____
☐ 21) Object Avoidance
☐ 22) Unknown ☐

| Plate / Permit No.: 898KKV | State ☐ 1) NV NV | Expiration Date: 7/27/2012 | Vehicle Color: RED |
|---|---|---|---|

| Vehicle Identification Number: KMHHN65F34U113195 |
|---|

| Registered Owner Name: ☐ 1) Same as Driver  LAMBERT, CARL |
|---|

| Registered Owner Address: 2981 PANORAMA RIDGE DR, HENDERSON, NEVADA 89052 |
|---|

| Insurance Company Name: ☒ 1) Insured  PROP & CASUALTY  INS CO OF HARTFORD | **1st Contact** | **Damaged Areas** |
|---|---|---|

| Policy Number: 55PHL586676-355900 | Effective: 07/30/2011 | To: 07/30/2012 |
|---|---|---|

| Insurance Company Address or Phone Number: 1-800-423-6789 |
|---|

**1st Contact**
☒ 2   ☐ 3   ☐ 4
☐ 1             ☐ 5
☐ 8   ☐ 7   ☐ 6

**Damaged Areas**
☒ 1) Front
☐ 2) Right Side
☐ 3) Left Side
☐ 4) Rear
☐ 5) Right Front
☐ 6) Right Rear
☐ 7) Top
☐ 8) Under Carriage
☐ 9) Left Front
☐ 10) Left Rear
☐ 11) Unknown
☐ 12) Other

| ☐ 1) Vehicle  Towed By: AAA | ☐ 1) Override  ☐ 2) Under Ride |
|---|---|

| Removed To: DEALER, | | |
|---|---|---|

**Traffic Control**
1) Speed Zone
2) Signal Light     F
3) Flashing Light ____
4) School Zone ____
5) No Passing ____
6) No Controls ____
7) No Controls ____
8) Warning Sign ____
9) Turn Signal ____
10) Other ____

11) Stop Sign ____
12) Yield Sign ____
13) R. R. Sign ____
14) R. R. Signal ____
15) R. R. Signal ☐
16) Marked Lanes ____
17) Tire Chains/Snow Req. ____
18) Permissive Green ____
19) Unknown ☐

| Distance Traveled After Impact | **Speed Estimate** From: 25  To: 35  Limit: 35 | **Extent Of Damage** ☐ 1) Minor  ☐ 4) Total  ☐ 2) Moderate  ☐ 5) None  ☒ 3) Major  ☐ 9) Unknown |
|---|---|---|

**Sequence Of Events**

| | Code # | Description | Collision With Fixed Object | Most Harmful Event |
|---|---|---|---|---|
| 1st | 214 | MOTOR VEHICLE IN TRANSPORT | ☐ | ☒ |
| 2nd | | | ☐ | ☐ |
| 3rd | | | ☐ | ☐ |
| 4th | | | ☐ | ☐ |
| 5th | | | ☐ | ☐ |

| ☐ 1) MVC  ☐ 2) GFR  ☐ 3) CC / HC  ☐ 4) Pending (1) | Violation | NOC | Citation Number |
|---|---|---|---|
| ☐ 1) MVC  ☐ 2) GFR  ☐ 3) CC / HC (2) | Violation | NOC | Citation Number |

| Investigator(s): ADAMS, DAVID | ID Number: 1184 | Date: 04/11/2012 | Reviewed By: PANET-SWANSO64 | Date Reviewed: 04/11/2012 |
|---|---|---|---|---|

**Vehicle Information**

Page 4 of 6

# EXHIBIT B

# EXHIBIT B

EXHIBIT 21.01

# The Hartford Financial Services Group, Inc.

Organizational List — Domestic and Foreign Subsidiaries

1stAgChoice, Inc. (South Dakota)
Access CoverageCorp, Inc. (North Carolina)
Access CoverageCorp Technologies, Inc. (North Carolina)
American Maturity Life Insurance Company (Connecticut)
Archway 60 R, LLC (Delaware)
Business Management Group, Inc. (Connecticut)
DMS R, LLC (Delaware)
Downlands Liability Management Ltd. (United Kingdom)
Excess Insurance Company, Limited (United Kingdom)
Fencourt Reinsurance Company, Ltd. (Bermuda)
First State Insurance Company (Connecticut)
Fountain Investors I LLC (Delaware)
Fountain Investors II LLC (Delaware)
Fountain Investors III LLC (Delaware)
Fountain Investors IV LLC (Delaware)
FTC Resolution Company, LLC (Delaware)
Hart Re Group, L.L.C. (Connecticut)
Hartford Accident and Indemnity Company (Connecticut)
Hartford Administrative Services Company (Minnesota)
Hartford Casualty General Agency, Inc. (Texas)
Hartford Casualty Insurance Company (Indiana)
Hartford Financial Products International Limited (United Kingdom)
Hartford Financial Services, LLC (Delaware)
Hartford Fire General Agency, Inc. (Texas)
Hartford Fire Insurance Company (Connecticut)
Hartford Funds Distributors, LLC (Delaware)
Hartford Funds Management Company, LLC (Delaware)
Hartford Funds Management Group, Inc. (Delaware)
Hartford Holdings, Inc. (Delaware)
Hartford Insurance Company of Illinois (Illinois)
Hartford Insurance Company of the Midwest (Indiana)
Hartford Insurance Company of the Southeast (Connecticut)
Hartford Insurance, Ltd. (Bermuda)
Hartford Integrated Technologies, Inc. (Connecticut)
Hartford International Life Reassurance Corporation (Connecticut)
Hartford Investment Management Company (Delaware)
Hartford Life and Accident Insurance Company (Connecticut)
Hartford Life and Annuity Insurance Company (Connecticut)
Hartford Life Insurance Company (Connecticut)
Hartford Life, Inc. (Delaware)
Hartford Life International Holding Company (Delaware)
Hartford Life, Ltd. (Bermuda)
Hartford Life Private Placement, LLC (Delaware)
Hartford Lloyd's Corporation (Texas)
Hartford Lloyd's Insurance Company (Partnership) (Texas)
Hartford Management, Ltd. (Bermuda)
Hartford of Texas General Agency, Inc. (Texas)
Hartford Residual Market, L.L.C. (Connecticut)
Hartford Securities Distribution Company, Inc. (Connecticut)
Hartford Specialty Insurance Services of Texas, LLC (Texas)
Hartford Strategic Investments, LLC (Delaware)
Hartford Underwriters General Agency, Inc. (Texas)
Hartford Underwriters Insurance Company (Connecticut)
Hartford-Comprehensive Employee Benefit Service Company (Connecticut)
HDC R, LLC (Delaware)
Heritage Holdings, Inc. (Connecticut)

II-41

Heritage Reinsurance Company, Ltd. (Bermuda)
HIMCO Distribution Services Company (Connecticut)
HLA LLC (Connecticut)
HL Investment Advisors, LLC (Connecticut)
Horizon Management Group, LLC (Delaware)
HRA Brokerage Services, Inc. (Connecticut)
Lanidex Class B, LLC (Delaware)
New England Insurance Company (Connecticut)
New England Reinsurance Corporation (Connecticut)
New Ocean Insurance Company, Ltd. (Bermuda)
Nutmeg Insurance Agency, Inc. (Connecticut)
Nutmeg Insurance Company (Connecticut)
Pacific Insurance Company, Limited (Connecticut)
Planco, LLC (Delaware)
Property and Casualty Insurance Company of Hartford (Indiana)
Revere R, LLC (Delaware)
RVR R, LLC (Delaware)
Sentinel Insurance Company, Ltd. (Connecticut)
Sunstone R, LLC (Delaware)
Symphony R, LLC (Delaware)
The Evergreen Group Incorporated (New York)
The Hartford International Asset Management Company Limited (Ireland)
Trumbull Flood Management, L.L.C. (Connecticut)
Trumbull Insurance Company (Connecticut)
Twin City Fire Insurance Company (Indiana)

# EXHIBIT C

# EXHIBIT C

This ENDORSEMENT Page, With Policy Jacket Form 8527 And Forms
And Endorsements Listed Below AMENDS your PERSONAL AUTO POLICY
CH.# 01 EFF.04-25-1 

INSURER: PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD
200 HOPMEADOW STREET, SIMSBURY, CT 06089

## DECLARATIONS

POLICY NO. 55 PHJ586676

**COPY**

Named Insured and
Mailing Address ———————➤ LAMBERT,CARL J & MARY-JEAN
2981 PANORAMA RIDGE DR
HENDERSON,NV   89052

Policy Period 12:01 A.M. Standard Time
at the Address of the Named Insured ——➤FROM 07-30-11 TO 07-30-12  TERM: 1 YEAR

BILLING ID NUMBER: 84670267
Producer Name:                                          Code: 355900 JUH
CUSTOMER SERVICE: 1-800-423-6789     CLAIM SERVICE: 1-877-805-9918

COMBINED
TOTAL POLICY PREMIUM:  $  1511.00

| Auto No. | Description of Autos or Trailers | Vehicle ID Number | Class | Terr. |
|---|---|---|---|---|
| 1 | 07 HYUND   SANTA FE SE/LIMI | 5NMSH13E37H014919 | B774FJ | 015 |

### COVERAGE IS PROVIDED ONLY WHERE A PREMIUM IS SHOWN FOR THE AUTO AND COVERAGE.

COVERAGES AND LIMITS OF LIABILITY                     PREMIUMS BY AUTO

                                                                                    1

A. LIABILITY
   BODILY INJURY     EACH PERSON   $  250,000
                     EACH ACCIDENT $  500,000 $  456.00
   PROPERTY DAMAGE   EACH ACCIDENT $  100,000 $  150.00

B. MEDICAL PAYMENTS   EACH PERSON   $   10,000 $   92.00

D. DAMAGE TO YOUR AUTO     AUTO                     ACV = ACTUAL CASH VALUE
   OTHER THAN COLLISION       1
      ACV LESS DEDUCTIBLE $  50            $   61.00
   COLLISION
      ACV LESS DEDUCTIBLE $ 500            $  233.00
   TOWING & LABOR COSTS
      EACH DISABLEMENT    $  75            $    8.00

OPTIONAL TRANSPORTATION EXPENSES
 UP TO $30 PER DAY TO A MAXIMUM OF $900    $   25.00

COUNTERSIGNED BY   *Kristine R. Gas*                     AUTHORIZED AGENT

----CONTINUED ON PAGE 2----

000000

FORM A-4800-0   (Ed. 2/01)  AP

```
DECLARATIONS (CONTINUED)              POLICY NO. 55 PHJ586676
     NAMED INSURED:  LAMBERT,CARL J & MARY-JEAN


                                        1
                   -------------------------------------------------
           TOTAL PREMIUM EACH AUTO $1025.00
                                     -------------------------------
                                                 PER POLICY PREMIUM
C. UNINSURED MOTORISTS COVERAGE
              BODILY INJURY          $  250,000 PER PERSON
                                     $  500,000 PER ACCIDENT $ 298.00

-------------------
ACCT NO. 84670267            COMBINED RETURN PREMIUM     $   276.00
                                     ------------------------------


LOSS PAYEE/ADDITIONAL INSURED
AUTO HYUNDAI MTR AMER
  P1 P O BOX 650600
     HUNT VALLEY          MD 21065

FORMS AND ENDORSEMENTS NOW MADE PART OF THIS POLICY:
A-4832-1   LIFETIME CONTINUATION AGREEMENT - AUTO
A-5719-0   COVERAGE FOR DAMAGE TO YOUR AUTO EXCLUSION ENDORSEMENT
A-5865-1   DISAPPEARING COLLISION DEDUCTIBLE
A-5893-0   PERSONAL AUTO INSURANCE PROGRAM SPECIAL EXTENSIONS OF COVERAGE
A-5260-1   WAIVER OF COLLISION DEDUCTIBLE
A-5698-1   SAFE DRIVER INSURANCE PLAN - NEVADA
A-5552-0   SUPPLEMENTAL DEATH BENEFIT ENDORSEMENT
A-5579-2   LIMITED MEXICO COVERAGE
A-6046-0   RECOVERCARE ESSENTIAL SERVICES COVERAGE
A-5741-4   AMENDMENT OF POLICY PROVISIONS - NEVADA
A-6075-0   ENHANCED COV PERM INSTALL AUDIO VISUAL DATA REC TRANS EQUIP
A-5420-1   OPTIONAL LIMITS TRANSPORTATION EXPENSES COVERAGE

THE AUTOS DESCRIBED IN THIS POLICY ARE PRINCIPALLY GARAGED AT THE ADDRESS SHOWN
ON PAGE 1
```

DECLARATIONS (CONTINUED)                POLICY NO. 55 PHJ586676
      NAMED INSURED:  LAMBERT,CARL J & MARY-JEAN

                          *  PLEASE NOTE  *
        THE RATING CLASS FOR AUTO NO. 1 HAS BEEN CHANGED
        AUTO NO. 2 HAS BEEN DELETED FROM THE POLICY

               THE FOLLOWING ITEMS ARE ENCLOSED FOR YOUR REVIEW:
    PLIMA-4146      PASSALONG RFQ

We were able to apply an additional credit to your policy premium because
you also insure your home with us.


Because a vehicle is equipped with an air bag safety feature your
policy premium has been reduced.

Because a vehicle is protected by an anti-theft device, we were able to
give you an additional credit.

Your single car policy has been rated with a multi car credit.


Call us toll-free at 1-800-423-6789 if you have any questions or changes to
your policy.

If you're ever in an accident ... report it right away!  Put the resources,
reputation and resolve of The Hartford to work for you immediately!
Call 1-877-805-9918.


                          DRIVER INFORMATION

NO. NAME                   DOB     MS SEX OCC         LIC #              DT LIC
1   LAMBERT,CARL J         080949  M   M  RETIRED     2100893192      NV 080965
2   LAMBERT,MARY-JEAN      122161  M   F  PROSECUTOR  1700892626      NV 122177


U-1000-0, PERSONAL UMBRELLA LIABILITY POLICY REMAINS ATTACHED
PREMIUM STATEMENT:
      TOTAL AUTOMOBILE POLICY PREMIUM             $ 1,323.00
      TOTAL UMBRELLA LIABILITY POLICY PREMIUM     $   188.00
      COMBINED TOTAL PREMIUMS                     $ 1,511.00


                                    05-09-12  05-09-12  05-10-12

FORM A-4800-0    (Ed. 2/01)  AP

This DECLARATIONS Page and POLICY PROVISIONS and endorsements, if any, issued to form a part hereof COMPLETES this

# PERSONAL UMBRELLA LIABILITY POLICY

All the provisions, stipulations and other terms of this policy shall apply only as specified herein and none of the provisions, stipulations, and other terms of the policy to which this Personal Umbrella Liability Policy is attached shall apply to insurance hereunder.

INSURER:  PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD
200 HOPMEADOW STREET, SIMSBURY, CT  06089

**DECLARATIONS**

For attachment to Policy No.  55 PHJ 586676
**Items**
1. **Named Insured and Address** ——————→

> LAMBERT,CARL J & MARY-JEAN
> 2981 PANORAMA RIDGE DR
> HENDERSON,NV   89052

2. **Policy Term** 12:01 A.M., Standard Time at the Address of the Named Insured ——————→  From 07-30-11 To 07-30-12

Producer's Name                    Producer's Code

355900   JUH

THE HARTFORD

| 3. | **Limit of Liability** | $ 1,000,000 | each **occurrence** |

| 4. | **Retained Limit** | $NONE | each **occurrence** |

5. **Schedule of Underlying Insurance Policies**

| SCHEDULE OF UNDERLYING INSURANCE POLICIES | LIMIT OF LIABILITY |
|---|---|
| AUTOMOBILE LIABILITY<br>COMPREHENSIVE PERSONAL LIABILITY | $  250,000/$  500,000/$100,000<br>$500,000 |

6. **Form Numbers of Endorsements forming part of policy on effective date hereof:**
U-1000-0A PERSONAL UMBRELLA LIABILITY POLICY
U-1007-0  SUPPLEMENTARY UNINSURED/UNDERINSURED MOTORISTS COVERAGE
U-1127-1  AMENDMENT OF POLICY PROVISIONS - NEVADA

| TOTAL PREMIUM | $188.00 INCL |
|---|---|

The Policy Provisions printed on pages PULP-2 through PULP-10 of this form are hereby referred to and made a part hereof.

Countersigned by_____ Authorized Agent

U-1000-0  (Ed. 2/02)  B                    **PULP-1**

# EXHIBIT D

# EXHIBIT D

| TIME RECEIVED<br>August 9, 2016 1:26:53 PM EDT | REMOTE CSID<br>7020000000 | DURATION<br>94 | PAGES<br>4 | STATUS<br>Received |
|---|---|---|---|---|

08-09-16;10:24AM;From:          To:18668098054    ;7020000000        #  1/  4

# BERNSTEIN & POISSON

*Attorneys and Counselors at Law*
*320 S. Jones Boulevard*
Las Vegas, Nevada 89107
TELEPHONE: (702) 256-4566   FACSIMILE: (702) 256-6280

Jack G. Bernstein, Esq. †
Scott L. Poisson, Esq. †‡
Christopher D. Burk, Esq. ‡⊤
James "Jamie" H. Corcoran, Esq. ⊤

Brian M. Boyer, Esq. ⊤
Sean J. Akari, Esq. ⊤
Erik A. Bromson, Esq.
Jennifer Gastelum, Esq. ‡

† Also Licensed in Florida
‡ Also Licensed in Arizona
⊤ Also Licensed in California

August 9, 2016

*Via Facsimile* (866) 809-8054
Hartford Insurance
P.O. Box 14266
Lexington, KY  40512

**Attention: Ms. Staci Moore**

Re:     *Our Client:*        ***Mrs. Mary-Jean Lambert***
        *Your Insured:*      ***Mary Jean Lambert***
        *Date of Incident:*  ***April 11, 2012***
        *Claim #:*           ▮▮▮▮▮▮▮▮▮▮

Dear Staci,

    The third party's insurance carrier has offered to resolve this claim for $1 less than the third party policy limits. They are offering $99,999.

    Demand is hereby made for YOUR FULL POLICY LIMITS. Please tender your limits so we can present the offer to our client. If you do not respond by **August 15, 2016** we are expressly authorized by our client to proceed with litigation including a Demand for Jury Trial.

Sincerely,
**BERNSTEIN & POISSON**

Christopher D. Burk, Esq.

CDB/j

# EXHIBIT E

# EXHIBIT E

Page 3 of 3

117 F.3d 1423 (Table)

117 F.3d 1423 (Table), 1997 WL 377041 (9th Cir.(Nev.))

(Cite as: 117 F.3d 1423, 1997 WL 377041 (9th Cir.(Nev.)))

Page 2

© 2003 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THE TRIAL REPORTER of Nevada                                      November, 2001

~ CLARK COUNTY ~

~ WASHOE COUNTY ~



Page 1 of 2

**Parties:** G. Clinton Merrick, Plaintiff vs, Paul Revere Life Insurance Company and UnumProvident Corporation, Defendants

**Court:** United States District Court, District of Nevada

**Docket No.:** CV-S-00731-JCM-RJJ

**Date of verdict:** December 13, 2004

**Plaintiff's Trial Counsel:** Richard H. Friedman, Friedman, Rubin & White, Bremerton , Washington and Ellis A. Morroll, Gillock Markley & Killebrew, Las Vegas Nevada . Additional Counsel, Charlie McB Saxon, Cox Gage & Saxon , Charlotte , NC

**Plaintiff's Counsel Contact Information:**

| Richard H. Friedman, e-mail: rich@rich@frwlaw.us Friedman, Rubin & White 1126 Highland Avenue Bremerton, Washington 98337 Phone: 360-782-4300 Fax: 360-782-4358 | Ellis A. Morroll, Esq. e-mail: morrck@gmk-law.com Gillock, Markley & Killebrew, P.C. 428 4th Street Las Vegas, Nevada 89101 Phone: 702-385-1412 Fax: 702-385-2608 | Charlie McB. Saxon, Esq. e-mail: Attorney1@aol.com Cox, Gage & Saxon 227 West Trade Street, Ste. 211 Charlotte, North Carolina 28202 Phone: 704-342-4300 Fax: 704-342-0794 |

**Facts:** Plaintiff, a venture capitalist, purchased a Paul Revere Life Insurance Company's own-occupation, non-cancelable, guaranteed renewable disability insurance policy in 1989. Policy benefits were $12,000 per month and the policy provided that payment would be made if because of injury or illness Merrick could not perform the important duties of his occupation.

In 1991 and 1992, plaintiff began to suffer the effects of chronic fatigue syndrome though it went undiagnosed for a period of time. His work performance suffered and he was forced out of his venture capital firm in 1993. Plaintiff continued to attempt to work but by 1994 realized he could not meet the grueling business travel and analytic requirements of a venture capitalist. He put his interest, Paul Revere Life Insurance Company on notice of claim in 1994 and filed his claim in 1995. Paul Revere accepted liability in 1995 and continued to pay benefits until December 1996 when benefits were terminated because of a lack of objective medical evidence of disability. Plaintiff had received his CFS diagnosis from both a local neurologist and the Mayo Clinic. In 1995 after accepting liability on the claim defendant had plaintiff submit to an IME which, while disagreeing with the CFS diagnosis concurred in the finding that plaintiff was disabled from his occupation. In June 1996 and again in November 1996 defendants attempted to settle the disability claim with a low offer. Evidence at trial established that at the time of the November 1996 buyout offer defendant's field representative told plaintiff that if he did not accept the settlement the company might sue him for the back benefits that had been paid. Claim file documents revealed that defendants had no new medical evidence upon which to base the termination and the termination was sought on a rush basis. At the time of termination defendants knew that CFS could not be established by objective medical testing and that such testing at did exist could only point to other causes of plaintiff's problems but could not eliminate CFS as the diagnosis. Other evidence in the claim file suggested that prior to terminating benefits defendants considered classifying plaintiff's occupation at time of disability as "unemployed" and considered denying the benefits because plaintiff could do the important duties of an "unemployed person."

Page 2 of 2

After benefits were terminated plaintiff tried to meet the "objective evidence" standard defendants had imposed and defendants repeatedly rejected the evidence plaintiff proffered. Plaintiff asked defendants what evidence would suffice and was told that they could not advise him since they were not doctors. He offered to take any test defendants wanted but they did not request any.

Plaintiff filed suit in February 2000. Defendants then engaged in scorched earth litigation against him seeking to investigate his health, personal, and professional life in a manner they had not prior to terminating the claim.

Plaintiff's allegations:   The primary allegations of plaintiff's complaint were that in terminating benefits defendants breached the disability insurance contract and acted in bad faith. Plaintiff sought back due benefits, damages for emotional distress, and punitive damages.

Damages: At trial defendants stipulated to the amount of back due benefits, $1,147,333.

Defenses: At trial defendants claimed that plaintiff had never been disabled. That he had begun planning to file a disability claim in 1988 after he began to have difficulties at work and that his claim was malingered. Defendants had not asserted a malingering claim either at the time benefits were denied or in the interim between initial benefit denial in December 1996 and the filing of suit in 2000. Defendants had never reported any suspicion of fraud to the commissioner of insurance or state attorney general as required by Nevada law.

Plaintiff's and defendants' experts: Plaintiff's liability experts: Stephen Prater, insurance practices, San Jose , California ; Defendants' expert: James E. Rosenberg, MD, forensic psychiatrist, Los Angeles , CA ,

Result: Jury verdict. The jury awarded the full stipulated value of benefits $1,147,333 for breach of contract. It awarded $500,000 for emotional distress arising from the bad faith. The jury awarded $2,000,000 in punitive damages against Paul Revere Life Insurance Company and $8,000,000 separately against UnumProvident Corporation for a total verdict of $11,647,333.

Special Comments:  Claims for chronic fatigue syndrome are difficult to prove and faced with a malingering defense the client's credibility and that of supporting witnesses became a critical factor in case presentation. Plaintiff's theory of the case looked at the practices begun at Provident Life and Accident Insurance Company were bought to Paul Revere and influenced its claims handling practices with respect to this claim both before termination and after. Plaintiff used corporate documents and expert testimony to establish the norms. Plaintiff's counsel was also able to circumstantially show that defendants' forensic psychiatrist was part of an in-house developed group of forensic consultants that the defendants look to for purposes of finding and justifying bases for claim denials. Defendants' expert admitted that outside of litigation he had done 35 IMEs for the defendant insurers. Though he claimed he subspoke he testified that he had started with the assumption of malingering and then looked for facts to support it. Plaintiff demonstrated this was true through cross-examination of the expert which demonstrated he had twisted the meaning of records. Plaintiff also demonstrated that defendants had failed to read their expert all pertinent documents.

1  Julie A. Mersch, Esq.
   Nevada Bar No. 004695
2  e-mail: jam@merschlaw.com
   701 S. 7th Street
3  Las Vegas, NV 89101
   702-387-5868
4  702-387-0109 fax

5  Richard H. Friedman, Esq.
   e-mail: rfriedman@frwlaw.us
6  Friedman, Rubin & White
   1126 Highland Avenue
7  Bremerton, Washington 98337
   360-782-4300

8
   Attorneys for Plaintiff
9  G. CLINTON MERRICK, JR.

10                    UNITED STATES DISTRICT COURT

11                         DISTRICT OF NEVADA

12

13  G. CLINTON MERRICK, JR.,              )   CASE NO. CV-S-00-0731-JCM-RJJ
                                          )
14              Plaintiff,                )
                                          )
15      vs.                               )
                                          )   FINDINGS OF FACT AND
16  PAUL REVERE LIFE INSURANCE            )   CONCLUSIONS OF LAW RE:
    COMPANY, a Massachusetts corporation; )   DEFENDANTS' MOTION FOR NEW
17  UNUMPROVIDENT CORPORATION             )   TRIAL, REMITTITUR OR REDUCTION
    (d/b/a UNUM LIFE INSURANCE            )   OF PUNITIVE DAMAGES
18  COMPANY OF AMERICA and                )
    PROVIDENT LIFE AND ACCIDENT           )
19  INSURANCE COMPANY); and DOES I        )
    through X Inclusive, and ROES I through )
20  X, Inclusive,                         )
                                          )
21              Defendants.               )
                                          )

22  I. INTRODUCTION

23          On June 25, 2008, the jury in this matter returned punitive damage verdicts

24  against each of the Defendants.  Document Nos. 507, 508.  Judgment was entered by

25  the Court on July 3, 2008.  Document No. 512.  On July 18, 2008, Defendants' filed a

26  motion for new trial, remittitur or reduction of punitive damages.  Document No. 514.

27  On August 5, 2008, Plaintiff filed his responsive pleading.  Document No. 515.  Having

28  independently assessed the facts of the case and taking into account the Court's view

1   of the credibility of witnesses and the arguments of the parties, the Court now enters

2   the findings of facts and conclusions of law set forth below.

3   II.   FINDINGS OF FACT

4   Throughout the trial the Court kept careful notes of the testimony of witnesses

5   and the exhibits that the parties relied upon.  In coming to these factual findings the

6   Court had the opportunity to assess the credibility of witnesses.  The Court observed

7   the witnesses on direct and cross-examination.  Among other things, the Court had the

8   opportunity to assess witness demeanor and these findings are based in part on these

9   credibility determinations.

10   A.   Defendants Were Engaged In A Scheme To Deny Claims Of
          Their Disabled Policyholders

11   The Ninth Circuit has previously found that evidence exists that these

12   Defendants "had a conscious course of conduct firmly grounded in established

13   company policies that disregarded the rights of insureds."  *Hangarter v. Provident Life*

14   *and Accident Ins. Co.*, 373 F.3d 998, 1014 (9th Cir. 2004).  The evidence described

15   here, more extensive than that described in *Hangarter*, and more extensive than that

16   admitted at the first trial of this matter, when the jury returned a punitive verdict of

17   $8,000,000 against UnumProvident and $2,000,000 against Revere, clearly,

18   convincingly and overwhelmingly, supports this factual conclusion.

19   1.   Early in the 1990's Defendant UnumProvident realized that the claims made on

20   the own occupation insurance policies that it sold were putting the company at

21   risk.  Ex. 22.

22   2.   As a consequence the company underwent a major restructuring of its claim

23   handling practices and philosophy.  Provident went from a company that had a

24   claim payment philosophy to one that had a claims "management" philosophy.

25   The results were profound.

26   3.   Among the tactics that Provident developed as part of its new claims

27   management approach was the targeting of what it labeled "subjective claims."

- 2 -

1    These were claims based on mental or nervous disorders or claims such as

2    fibromyalgia or chronic fatigue syndrome ("CFS"). These claims which could not

3    be proven by hard medical evidence such as an x-ray were thought to contain a

4    large potential for resolution based on the vulnerability of insureds to pressure

5    tactics. Ex. 44, Ex. 113 at 331.

6  4.   Another of the tactics that Provident implemented was its practice of claim

7    objectification. Through its practice of imposing objective evidence requirements

8    on its insureds, when its policies contained no such standard, Provident sought

9    to defeat their claims. This standard was imposed even on claims, like Merrick's,

10   where the company knew there was no way to obtain objective evidence. Ex.

11   174; Ex. 235; Ex. 326; Ex. 327; Ex. 348.

12  5.   A third tactic that Provident developed was its use of round table reviews. These

13   reviews which involved claim personnel, medical staff, vocational staff, legal

14   counsel, and management personnel focused on high indemnity claims. Ex. 99.

15   While notes were occasionally made of what direction the claim should take after

16   a round table review, company policy was to destroy all information regarding

17   who participated in the meetings, what was discussed, and the basis for any

18   decision. Ex. 113 at 108; Ex. 325, Ex. 326, 327. Defendants' also attempted to

19   cloak the round tables with the attorney-client privilege in order to further insulate

20   the actual claims decisions and basis therefore from review. Ex. 99, Ex. 6.

21  6.   A fourth tactic that was developed was the Defendants' practice of shifting the

22   burden of claims investigation to the insured. Ex. 235; Ex. 325, 326, 327. It was

23   undisputed it is an insurer's duty to conduct a reasonable investigation into all

24   available relevant information prior to denying a claim. It was undisputed that an

25   insurer must conduct a reasonable and fair evaluation of the evidence in a non-

26   adversarial fashion. It was undisputed that an insurer may not deny or terminate

27   a claim based on speculation. It was undisputed that an insurer may not use

28   biased or predictable experts. It was undisputed that insurers have a duty to

- 3 -

1   assist the insured with the claim. Ex. 218. Despite the existence of these

2   undisputed obligations that exist in the handling of first party claims, the evidence

3   established that Defendants instructed their employees that it was the insured's

4   obligation to prove his claim. Ex. 229. Employees were instructed to limit their

5   use of independent medical examinations ("IMEs"). Id. They were told that IMEs

6   were not to be used unless absolutely necessary. Id.

7   7.   The limitation on the use of IMEs to gather information was part and parcel of

8        another practice—that of overvaluing the opinions of in-house medical personnel

9        who never examined the insured over the opinions of either treating physicians

10       or IME doctors. Ex. 235. As set out below, Defendants engaged in that conduct

11       in Merrick's case.

12  8.   Similarly, Defendants' in-house medical personnel engaged in cherry picking

13       records to find grounds for denying claims regardless of actual merit. Ex. 235,

14       325. Documentary evidence established that in-house medical personnel "focus

15       upon any apparent inconsistencies in the medical records or other information

16       supplied by claimants, rather than attempt to derive a thorough understanding of

17       the claimant's medical condition." Ex. 235.

18  9.   The evidence established that Defendants had a practice of piecemealing

19       claimants' medical conditions and did not consider the totality of the medical

20       circumstances. Ex. 235, Ex. 325. As discussed below, Defendants did that in

21       Merrick's case.

22  10.  Defendants set targets and goals for claim terminations to obtain financial gain

23       and without respect to claim merit. Ex. 325, Ex. 326, Ex. 327. Defendants

24       denied the existence of such targets and goals but the evidence at trial on this

25       point was overwhelming.  The testimonial and documentary evidence

26       a.   Established the existence of targets and goals to terminate claims.

27            Testimony of Stephen Rutledge; Testimony of Stephen Prater;

28       b.   Established the existence of net termination ratio targets on a corporate

-4-

1          basis, Ex. 1, 5, 46, 68, 111, 115, 116, 124, 135, 141, 144;[1]

2        c.  Established the existence of financial targets for closing claims on a

3           corporate basis, Ex. 49, 52, 95;

4        d.  Established that those corporate goals were transmitted to claim handling

5           units which felt the "reserve pressure," Ex. 68, 268;

6        e.  Established that claim handling units were requested to obtain certain

7           amounts in claim closures or recoveries, Ex. 239, Ex. 242;

8        f.  Established that when units were not able to make their goal on a weekly

9           basis that they were required to develop written action plans to bring their

10          closures in line with the goals that were set. Ex. 232;[2]

11       g.  Established that these targets and goals were communicated to claim

12          handling employees by such means as e-mails, and weekly Staff

13

14   _____

15   [1] Defendants claimed, and there was evidence that not all terminations are the result of
16   improper denials. That is undoubtedly true. Individuals do get better and return to
     work. Policyholders' benefits expire. Policyholders age out so that benefits are no
17   longer payable. And, policyholders die. But, the evidence also established that the
     Defendants set targets and goals beyond their actuarial expectations for claim closures
18   based on these factors. The evidence established that Defendants went looking for
     ways and claims to close in order to meet their financial goals.

19   [2] The Worcester Resolution Consistency Strategy stated in part:

20
         Each Impairment Unit will be evaluated weekly to determine if recovery
21       momentum is more or less concentrated than expected, based on
         historical month-end recovery averages. Units that are less concentrated
22       than expected will be charged with the task of developing a written,
         detailed Action Plan designed to identify causes for the slower than
23       expected momentum and outline activities that will be initiated to bring
         momentum back in line with expectations. These Action Plans will be
24       developed and reviewed with me within 24 hours of release of the Monthly
25       Trends report. This exercise is designed to achieve greater accountability
         at all management levels for consistent results week to week.
26
         Furthermore, additional emphasis will be provided at each of my weekly
27       Staff Meetings, as well as at each Impairment Head Staff Meeting, not
         only around forecasting (and forecasting methodology) but also around
28       current trends and focus on improved momentum as necessary.

1         Meetings.  Ex. 261,[3]  Ex. 260,[4] Ex. 259,[5]  Ex. 262, Ex. 232;[6]

2      h.   Established that to further pressure and give incentive to claims personnel

3         to find reasons to terminate claims, stock boards were set up in the claims

4         units and updated throughout the day so that claim personnel could see

5         how their activities were contributing to the UnumProvident's financial

6

7 _____

8 [3]    "Beingness" is the state in which you are ever present in whatever

9    activity you are  engaged in; IE absorbed in what you are currently doing.
   That is better than being recoveryless,...

10 Dated June 10, 2002 6:28 AM

11 [4] This e-mail is entitled "YIPPEEEEEEIII."  It states in part:

12    We had yet another excellent week, ...

13    No Reopens.... Month to date

14    ***
   We are already at $608,000 in recoveries well ahead of schedule.

15

16    We are still lagging with projections so we need to add more to the
   projection list.

17    Also, we don't have any r/w success stories on the board yet.

18    **Overall, we are cranking.... Thank you!!!!!**

19 Dated June 10, 2202, 9:47 AM(emphasis in original) "Recoveries" is a term
synonymous with "claim closures."

20

21 [5] An e-mail which reflects the pressure being put on claim personnel to find claims to
close states:

22    Folks:

23    As luck would have it, we are running out of it. ...

24    We are projected to have 1,800,000.00 in recoveries this month but are
   coming up short at 1,772,000.00... this includes the following that I would
   like updates on today:

25    ***

26    **Are there any other claims that are possible recoveries this
week????**

27 Dated June 25, 2002 8:55 AM (emphasis in original)

28 [6] See note 2 supra

1   results, Ex. 232;[7] and

2         I.     Established that the corporate plan and scheme permeated the company

3              and was known to and endorsed at the highest levels when the head of

4              claims reported to the Board of Directors. Ex. 281.[8]

5       11.    Provident was not the lone insurer facing financial difficulties as a result of the

6            poor product design, over marketing, and poor underwriting of its own occupation

7   _____

8   [7] This document contained within Exhibit 232 states:

9        UnumProvident stock boards will be erected on all Customer Care Center

10        floors. The stock price will be updated periodically throughout the day by
     an administrative assistant. The stock boards will serve to raise

11        awareness of corporate performance levels and build a greater sense of
     pride among the staff for Worcester's contributions to the corporation's

12        performance.

13   Encouraging claim handling employees to evaluate their performance based on their
contribution to corporate stock price further supports the conclusion that Defendants

14   were turning their claims handling operation into a profit center. This, despite the
undisputed evidence, that it would be inappropriate to use the claims operation in such

15   a manner. Ex. 218. Further, not only were employees encouraged to consider their
performance based on stock price, employees were actually made stock holders in the

16   company. Ex. 188 at MERG 0111, 0166. The use of stock boards in claim units
contributed to a corporate culture which elevated the financial interest of the

17   Defendants and employees over that of claim making policyholders.

18   [8] This March 29, 2000 Board of Director Meeting Minute states:

19

20        Mr. Mohney discussed the customer care organization. He introduced Mr.
     Arnold who he noted would be taking over the management of the

21        Portland Customer Care Center. He described metrics for measuring
     performance. Improvements reflecting the implementation of the model

22        previously used in Chattanooga and Worcester, in the Portland, Chicago
     and Glendale customer centers were described. Mr. Mohney noted that

23        they were seeing aggregate improvement and he was confident of the
     ability to meet the plan level previously proposed., although they were

24        somewhat behind plan at this point. ... Members of the Board questioned
     the effect of the timing of improvements in the claims management

25        process on reserves. Mr. Greving stated that the objectives were
     achievable and that the Company could incrementally strengthen.

26        Although this could have an effect on earning, he did not see any problem
     with respect to reserves in the next year. Mr. Mohney stated his belief

27        that the goals were achievable and that the same process consistently
     applied should create similar results that would support the target.

28

1  policies.  Other insurers faced similar problems.  Many of them left the disability

2  insurance business.  Paul Revere was one of the other large disability insurance

3  companies that had also heavily marketed the own occupation individual

4  disability products.  It too, had faced difficulties arising from these products and it

5  too had to revamp claim processes.  Ex. 44

6  12.  In April 1996 Provident and Paul Revere announced that they were going to

7  merge.  The merger was completed in the end of March 1997.  In 1999,

8  Provident Companies, Inc. merged with Unum to form UnumProvident.  In 1996,

9  Provident Companies, Inc. and Revere entered into a General Services

10  Agreement.  Ex. 146.  Under that agreement, Provident, and later

11  UnumProvident, took over all responsibility for handling Revere claims.  *Id*

12  13.  Before the General Services Agreement, and before the merger was even

13  completed, Provident was influencing Revere's claim processes.  *See, e.g.*, Ex.

14  114, Ex. 120, Ex. 122; Ex. 154.  By July 1996 transition teams were formed to,

15  among other things, identify "Best Practices" that the combined entities would

16  follow.  Ex. 104.  In October, 1996 Provident undertook to train all of Revere's

17  field investigators in "Best Practices."  Ex. 114.  These "Best Practices" included

18  the claim objectification process Provident had adopted as one of its techniques.

19  The round table process was brought to Revere in February, 1997, and

20  implemented on a daily basis before the merger was completed.  Ex. 268, Ex.

21  270, Ex. 120, Ex. 122.

22  **B.    Defendants' Scheme Was Engaged In To Augment Their**
23  **Profits At The Expense Of Their Disabled Insureds And Defendants' Profited Enormously**

24  Not only did the evidence at trial establish the existence of a corporate scheme

25  to augment profits without regard to the rights of their disabled insureds, it established

26  that, in fact, Defendants profited immensely from their misconduct.  The evidence

27  related to this issue extends from 1994 to the present and is briefly recapped here.

28  14.  An in house analysis authored by Provident's head of risk management in 1994

- 8 -

1   concluded that the company's non-cancellable own occupation policies

2   substantially impaired its financial capabilities.[9]

3   15.   In response to the financial crises Provident redesigned its claim process.  It

4   recognized that such redesign carried with it "tremendous leverage." Ex. 33.

5   16.   Among the areas recognized as creating large financial opportunities were

6   psychiatric claims and field investigators. Ex. 44.  As reported in that document

7   Revere was using its field investigators to close claims.  Defendants were

8   encouraged that by changing their claim handling practices they could achieve

9   substantial savings. Ex. 45.  Chronic fatigue claims were sent to the psychiatric

10   claims unit for intense handling. Ex. 75.

11   17.   As the Company completed its analysis, it recognized that changing its claim

12   practices, could have a large payout.  Initial estimates suggested that the

13   company could save between $30 and $60 million annually. Ex. 46.  Adjusters

14   were directed to make top ten lists of claims where "intensive effort will lead to

15   successful resolution of the claim." Ex. 61.

16   18.   It soon became obvious that the Company had wildly underestimated the

17   financial gain it could achieve by changing from a claim payment to a claim

18   management mode. Ex. 54, Ex. 59, Ex. 69, Ex. 73, Ex. 77, Ex. 80,[10] Ex. 87, Ex.

19

20   [9] Exhibit 22:

21

22   The disability operation continues to generate large statutory losses since
no special reserve was recorded on the statutory side jeopardizing the
23   company's ratings and financial flexibility.  Further, the existence of the
special reserve on the block of business written prior to 1994 creates a
24   huge drag on the company's reported ROE.  Over $300 million of capital
stands behind the special reserve block of business and essentially all
25   earnings other than the return on capital and surplus have been zeroed
out.

26   [10] In a January 1996 Memo Ralph Mohney wrote to Tom Heys:

27

28   Overall, we are both pleased and encouraged with the results of the claim
management activities during the quarter.  The $114.8 million of net
terminations (terminations minus reopens) represents a record level and

1    95, Ex. 102, Ex. 104, Ex. 106, Ex. 108, Ex. 111,[11] Ex. 115, Ex. 116[12]

2   19.   The Company began setting financial goals for terminations that were well above

3    what it had traditionally been able to achieve.  E.g., Ex. 52 (setting forth second

4    quarter 1995 goal for terminations of $132 million dollars, and reporting, "We

5    have a good shot at making goal which is 10% above last year.")

6   20.   Ultimately Provident Companies, Inc. went from a company with little financial

7    flexibility to a company with over $8 billion dollars in total stockholder equity.  Ex.

8    342 at 29.

9   21.   Revere in turn accumulated a surplus of over $1 billion in 2007 after declaring

10    stock and cash dividends of approximately $1 billion. Ex. 341 at 96, 118.

11   22.   Other evidence suggests that much of this accumulation in value came at the

12    expense of Defendants' policyholders.

13    a.   Under the limited claim reassessment process required by the Multistate

14     Market Conduct Examination settlement process, Defendants were

15     required to make claim payments and post additional reserves of

16     approximately $676.2 million dollars.  Ex. 612.

17    b.   These additional reserves and claim payments represented money owed

18     to a fraction of the claimants whose claims had been denied between

19     1997 and 2005 and who elected to participate in the claim reassessment

20     process required by the Multistate settlement.  Ex. 612.  Out of over

21     290,903 claimants that the Defendants mailed notices to, only 78,422

22     opted in.  Of that number only 23,190 completed the complex forms

23

24     _____

25    is 28 % ahead of the previous four quarter average.  Moreover, the fourth
     quarter represents the 3rd consecutive quarter of $100 million or more in

26    net terminations.

27   [11] Reporting a reduction of reserves of $121 million over the prior year.

28   [12] Reporting an annual net resolution ratio of 98%, 14% more than what had been
     earlier set as a goal.  Ex. 116.

1        necessary to have their claims reassessed.[19]  Of that number, the

2        Defendants reversed position on 41.7% of the claims.

3        c.    While Defendants would suggest that those who did not participate in the

4        reassessment were satisfied with the initial claim handling, little credible

5        evidence supports such a conclusion.  It is equally or more likely that

6        some individuals did not participate because 1) they did not receive

7        notice; 2) they died; 3) their trust in the company had been so abused

8        they chose not to participate; 4) that the forms were so complex or

9        required the provision of information the insured did not have so that they

10       were unable to complete them; 5) they did not have the basis to know

11       whether their claim had been improperly denied or terminated, and/or 6)

12       they did not want to give up legal rights they might have as required if they

13       obtained benefits under the reassessment process.

14       d.    Further supporting the conclusion that many of the non-reassessed claims

15       would have resulted in additional payments (and not reassessed remain

16       as improperly obtained financial gain) is the fact that approximately 42%

17       of the reassessed claims resulted in additional payment.  Ex. 612.

18    23.    Other evidence also suggests that the amount of newly made payments and

19       posted reserves understates the Defendants financial gain by a substantial

20       degree.  Exhibit 95 established that during the first quarter of 1996 as part of its

21

22    [19] For example, the form asks the participating claimant to provide detailed information
23    about the policy number, claim number, a detailed explanation about why the insured
       believed their claim had been mishandled (a difficult task at best in the absence of
24    detailed knowledge concerning claim handling practices, standards, and these
       Defendants perversion of the same, lengthy detailed employment history, lengthy
25    detailed medical form, other benefit information (without revealing that if the insured
       had sought unemployment benefits the company might take the position that they were
26    not disabled because their occupation was unemployed), Ex. 174 at 186, Ex. 347, *See,*
       *e.g., Norola v. Paul Revere Life Ins. Co., supra*; *accord Burriesci v. Paul Revere Life*
27    *Ins. Co.,* 255 A.2d 993, 679 N.Y.S.2d 778 (Sup.Ct.App.Div. 1998) (defendant engaged
       in bad faith by classifying insured's occupation as unemployed while injured while out of
28    work and on unemployment).

1    scheme Defendants were reporting quarterly terminations of $147.2 million "up

2    15.1 million (11.4%) from the previous four quarter average." It goes on to note

3    that these quarterly results "demonstrate[s] that the investments in claim

4    effectiveness over the last eighteen months are beginning to pay substantial

5    dividends." *Id.* Exhibit 52 showed Defendants with a target of $132 million in

6    quarterly claim terminations. Exhibits 239, 242, 259 demonstrate that the

7    Defendants were seeking millions of dollars in claim terminations from individual

8    claim units month after month. Such is reflected as well in the monthly unit

9    reports introduced into evidence, which demonstrate the pressure to achieve

10   high net termination ratios, *see, e.g.,* Ex. 137, 141, 144, 331,[14] 333,[15] and

11   millions of dollars of terminations through the roundtable process, Ex. 268, Ex.

12   270.

13   24.  Based on the credible testimony about targets and goals, documents, and the

14        duration of Defendants' misconduct, there is every reason to conclude that

15        Defendants gained well in excess of a billion dollars as a result of their claims

16        handling misconduct.

17

18   [14] Reporting Worcester's September 1999 Net Resolution Ratio in Reserves for
19   individual disability claims of 108.6% and reporting it as an improvement over July and
     August of that year. In the same document the Worcester claims operation reports an
20   LTD net resolution ratio in reserves of 120.6%.

21   [15] Reporting on Worcester results and characterizing them as "unfortunate" because
22   they were lower than average. The document further addresses how Worcester will
     remedy such "unfortunate" results:

23
         We are committed to a continued focus on activity levels, action plans and
24       roundtable reviews, which will improve our claim management
         effectiveness. We will be using "min-roundtable" beginning in August as a
25       form of follow-up on claims previously presented in roundtable, but which
         remain outstanding.
26
     In light of Exhibit 333, 268, and 270, there can be little question, that the purpose of the
27   roundtables continued to be a means to find a way to close claims, just as from their
     inception. Ex. 69, 85, 99, 135. No other interpretation of the Defendants' purpose or goal
28   for the process is credible.

- 12 -

C.   The Claims Handling With Respect to Merrick's Claim And The Harm He Suffered

Not only did Plaintiff establish the existence of a corporate scheme to augment profits at the expense of disabled policyholders, Merrick established that his claim was mishandled in a manner consistent with that scheme.

25.   Merrick purchased a non-cancellable, guaranteed renewable, own occupation, disability insurance policy from Defendant Paul Revere Life Insurance Company in 1989.

26.   Under the terms of the policy Merrick was entitled to benefits, if, due to illness or injury, he was unable to perform the material and substantial duties of his occupation. The policy does not require the existence of a particular injury or illness or even any diagnosis. If disabled from his occupation under the policy Merrick was entitled to benefits of $12,000 per month for as long as his disability lasted or until age 65, whichever came first. Merrick's policy was one of the "Cadillac" policies that disability insurers had sold in the 1980's and 1990's to doctors, lawyers, and other professionals.

27.   At the time Merrick purchased the policy he was a successful businessman. Merrick had worked his way through college graduating *cum laude* from the University of Tulsa. After graduating from college he enrolled in the Stanford MBA program. During the time he was in that program he worked for General Mills. After graduating from the Stanford program Merrick went to work for General Foods, ultimately becoming a vice-president of marketing and sales. After working for General Foods Merrick became the CEO of Mueller Pasta, the largest pasta manufacturer in the United States. He successfully led a management buy out of the company when First Boston purchased it for $425 million.

28.   Merrick's experience with the Mueller Pasta buy-out led him to become a partner in a venture capital firm. The firm specialized in consumer products. Among the more successful investments the firm made that Merrick was responsible for was

1    Boston Beer Company, the producer of Sam Adams beer.

2    29.   At all times relevant to this lawsuit, and the claims asserted herein, Merrick's

3    occupation was that of a venture capitalist.  Such an occupation required long

4    hours of work, substantial work-related travel, and the ability to read,

5    comprehend, evaluate, and explain, complex financial documents rapidly.  As a

6    venture capitalist Merrick had multiple responsibilities.  These included raising

7    funds to manage, evaluating potential business ventures for investment

8    purposes, investing and monitoring investments, and working with the companies

9    that the venture capital firm was invested on both an operational and strategic

10   levels to position them to go public.  It is through the process of public offerings

11   that much of the profit in venture capital is attained.

12   30.   In 1991 Merrick began suffering from a chronic low grade illness.  By 1993 it had

13   begun to substantially impact his performance in his venture capital firm and he

14   began negotiating his exit from the business because of his inability to perform.

15   In the end of July, 1994, Merrick wrote to Revere to put it on notice of claim

16   advising it that he was still trying to obtain a definitive diagnosis.

17   31.   Revere received Merrick's letter on August 2, 1994.  Upon receiving Merrick's

18   notice Revere was required to post a reserve, known as an incurred but not

19   reported reserve, IBNR.

20   32.   Given that Merrick's benefits under his policy were $12,000 per month, that

21   Merrick was fifty-one years old when he provided notice of claim, and that if

22   totally disabled he would be entitled to benefits until age 65, the IBNR reserve

23   was substantial.

24   33.   Between July of 1994 and February, 1995 Merrick continued to seek a definitive

25   diagnosis and treatment for his illness and in December 1994, after undergoing

26   physical, psychiatric and neuropsychological testing at the Mayo Clinic he was

27   diagnosed with Chronic Fatigue Syndrome.

28   34.   Merrick then filed all claim forms required of him and Revere, recognizing that

- 14 -

1       Merrick could no longer perform the material and substantial duties of his

2       occupation as a venture capitalist, put him on claim without a reservation of

3       rights.

4  35.   Before deciding to put Merrick on claim, Revere first considered whether it could

5       reclassify Merrick's occupation as that of an unemployed person. Ex. 174 at

6       188. If so, it would have denied his claim on the basis that he was capable

7       performing the material and substantial duties of an unemployed person, *e.g.*,

8       activities of daily living.[16] Two of Defendants' witnesses, Ms. Bostek and Mr.

9       DiLisio attempted to justify the unemployed-as-an-occupation analysis, but the

10      Court need not credit their explanations. Ms. Bostek admitted that if Revere had

11      been able to assert that Merrick, despite his years of employment as a venture

12      capitalist, was unemployed at the time disability arose, it would have denied the

13      claim. Mr. DiLisio, attempted to justify the unemployed as an occupation tactic

14      as a means to extend benefits. His explanation was so qualified and convoluted

15      it was not credible.

16  36.   During the time that Merrick was seeking to obtain a definitive diagnosis and

17      treatment, Defendant Revere repeatedly sought information on whether Merrick

18      intended to file a formal claim for benefits. While Defendants sought to

19      characterize this evidence as attempts to be of service to Merrick, another

20      interpretation is more likely -- if Merrick told Revere that he was not filing a claim,

21      the IBNR could be released, and money that Revere had to reserve to pay

22      Merrick's claim could be removed from its liabilities and added to its assets.

23  37.   Merrick remained on claim. Internal evaluations of his claim by Revere's medical

24      personnel concurred in his treating physicians' conclusions that Merrick was

25

26  [16] One court has described these Defendants' conduct in classifying individuals'
occupations as unemployed as "'pure poppycock' utterly bereft either of textual support
27  in the language of the insurance contract or the gloss place on such language by any
Arizona [the relevant jurisdiction] case." *Norris v. Equitable Life Assurance Society of*
28  *the United States*, 80 F.Supp.2d 1047, 1053 (D.Ariz. 2000).

1    substantially impaired.

2    38.  On August 2, 1995, through its field investigator Michael Kunkin, Revere offered

3         Merrick four months of benefits if he would give up his claim.  If he had accepted

4         the offer Merrick would have relinquished over $1.5 million in benefits.  At the

5         conclusion of the visit, Kunkin left Merrick a check for $12,000 representing one

6         month of benefits with an endorsement on the back constituting an agreement

7         that some kind of settlement had been reached regarding all liability under the

8         claim. (Ex. 174, at 222.)

9    39.  Defendants attempted to characterize this settlement offer as a "return to work

10        benefit."  No credible evidence suggests this was the case.  Revere had not

11        established that Merrick could go back to work as a venture capitalist.  It had not

12        identified any venture capitalist position that Merrick could work in with reduced

13        stress and on a part-time basis as recommended by his treating physicians.

14        Defendants further admitted that they had not offered Merrick any rehabilitation

15        assistance or services.

16   40.  At the meeting where the field investigator offered the claim settlement, he left

17        Merrick with the impression that if he did not take it, the company might sue him

18        for the benefits it had previously paid.

19   41.  Further supporting the view that Defendants were engaged in a low-ball

20        settlement attempt is found in corporate documents.  According to the

21        Provident/Paul Revere Transition Plan, Ex. 113, field settlements of greater than

22        three months of benefits were to be made only in return for a signed release,

23        meaning a completely final payment.[17]

24   _____

25   [17] Ex. 113 at 303:

26        [W]e recommend allowing Field Claim Representatives up to six months in
         benefits, to be used at their discretion for settlements.  In general,
27        however, settlements greater than three months would be expected to be
         in exchange of a signed release.  Otherwise, it must be questioned
28

- 16 -

1    42.    The Court concludes, as did Merrick, that Revere, in fact, was attempting to

2           obtain a settlement based on a low ball offer and a threat to engage in litigation.

3    43.    After Merrick turned down Revere's settlement offer it required that he attend a

4           neurologic IME as part of its claims investigation.  That IME took place on

5           November 20, 1995.  That neurologist, Dr. Donaldson also concluded that

6           Merrick was substantially impaired, though he disagreed with the diagnosis from

7           Merrick's treating physicians that Merrick suffered from Chronic Fatigue

8           Syndrome.  While Revere claimed there were some questions raised as to Dr.

9           Donaldson's opinion regarding the extent of Merrick's impairment, Revere never

10          sought to clarify its concerns.

11   44.    On January 29, 1996, Paul Revere advised Merrick that any further payments

12          would be made pursuant to a reservation of rights based on Dr. Donaldson's

13          conclusions that there was no objective evidence supporting Merrick's claim that

14          he was disabled by Chronic Fatigue Syndrome or Lyme Disease.  Ex. 174 at

15          279.

16   45.    While Merrick had previously had a large income and benefits from his

17          occupation as a venture capitalist, such income did not insulate him from

18          financial stress.  Money that had been saved for other purposes was used to

19          meet regular expenses.  In addition to his immediate family, Merrick was

20          providing support for his aged father, who was essentially indigent and his adult

21          daughter who had terminal breast cancer.  Merrick, along with others, was also

22          providing support to Young Mee Jeon, who would eventually become his wife

23          after his divorce.  At the time, she was attending a seminary.[18]

24   _____

25          whether or not this advanced payment makes sense in terms of being a
            completely final payment.  Advance payments for the sake of closure only,
26          with a significant expectation of reopening, would not be proper.

27   [18] Defendants assert Merrick was engaged in a cross-country affair with Young Mee
28   Merrick prior to his divorce.  That assertion was unsupported by any evidence at the
     second trial.  Merrick testified without dispute that he and his current wife only became

- 17 -

46. As a result of his illness and consequent loss of income, Merrick was attempting to scale back his expenses. His family began the process of selling his house in Connecticut.

47. By paying under reservation, Revere substantially impacted Merrick's peace of mind because he no longer felt assured of his monthly finances. Similarly, the threat of litigation substantially eroded the "peace of mind" that disability insurers know they are selling when they market their products.[18]

48. In November 1996, all the medical evidence in the file supported the fact that Merrick was disabled from his own occupation. Defendant's in-house evaluators concurred with Merrick's doctors on the issue of impairment, though they disagreed on diagnosis. Defendants' in-house evaluators knew that the lack of objective test results was not definitive with respect to whether Merrick suffered from Chronic Fatigue Syndrome. They knew that neuropsychological testing could not be used to diagnose the disorder. Ex. 174 at 343. *See also*, Ex. 348.[20]

49. In November 1996, after the Provident "Best Practices" training, Revere's

---

intimate after he was divorced, a divorce initiated by his ex-wife.

[19] *See, e.g., Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, 456, *modified on rehearing*, 622 P.2d 141 (Cal. 1979).

[20] Confirming the information in the file that neuropsychological testing could not be relied upon as a basis to deny the claim, this November 1997 internal memo authored by Defendants states in relevant part:

> On November 7, 1997 the following people met to discuss our handling the FMS and CFS claims. ...
>
> Our goal was to discuss these two illnesses, evaluate where we are in handling them and develop and action plan to move forward.
>
> Basically we have acknowledged the credibility of these diagnoses based on considerable research by high profile organizations. ... We realize that there are no clinical tests to objectify the diagnosis of CFS and FMS yet there are board certified physicians certifying to partial and total disability. We know there is no cure, no true treatments and no objective way to refute the diagnosis.

- 18 -

1     Investigator, Kunkin, returned to Merrick's house in Connecticut.  Merrick's son

2     had recently died, a fact the company was aware of.  Ex. 174 at 486-488.

3  50.  Despite the uniformity of opinion that Merrick was in fact disabled, in November

4     1996, after receiving Provident's training on claim objectification, Kunkin, as

5     directed, represented to Merrick that all of Revere's medical reviewers had

6     determined that he was not disabled.  Ex. 174 at 512.  Kunkin offered Merrick

7     two months of benefits in exchange for Merrick's agreement not to pursue further

8     benefits.  Ex. 174 at 508, 510.  Kunkin told Merrick that if he did not accept this

9     offer the company might sue him for benefits it had previously paid.  When

10    Merrick rejected this offer, Defendants terminated his claim.

11  51.  Along with the financial stress, the death of Merrick's son made him particularly

12    vulnerable to harm caused by Defendants when they terminated his benefits.  It

13    would be hard to conceive of a more vulnerable individual than a disabled

14    parent, who had recently suffered the death of a child.

15  52.  At the time of the second field visit by Kunkin in November, 2006, Merrick's claim

16    was targeted for closure on a rush basis.  Ex. 174 at 508.  Defendants had no

17    legitimate basis to terminate Merrick's claim in November, 1996.  Closing his

18    claim at that point served only Defendants' financial interest in removing a

19    substantial liability from their books as they approached the year end, thus

20    making it more likely that they would meet their net termination ratio and financial

21    goals for that quarter.

22  53.  In November 1996 Revere closed Merrick's claim supporting its denial on the

23    basis of a lack of objective evidence, though such was not a requirement of the

24    policy and despite its knowledge that CFS could not be diagnosed or measured

25    through such testing.  Ex. 174 at 343, 525, Ex. 348.

26  54.  After Revere terminated Merrick's benefits, he attempted on repeated occasions

27    to get his claim paid.

28  55.  Merrick specifically asked Defendants what testing they would consider sufficient

1    to support the claim.  Ex. 174 at 542-543.  Defendants refused to provide Merrick

2    with that information.  *Id.*  They concealed from Merrick what they in fact

3    knew—that there was no objective testing to measure the impairment or

4    establish the diagnosis.

5    56.   Each time Merrick submitted new information in support of his claim Defendants

6    rejected it.  On each occasion they asserted that the absence of objective

7    medical evidence precluded claim payment.  Ex. 174 at 539, 611.

8    57.   Defendants' knew that Merrick's illness could not be established by objective

9    evidence, but repeatedly insisted he produce such evidence, when their contract

10   did not permit them to do so.  Ex. 174 at 518, 525, 539, 536, 611.

11   58.   Defendants, shifted the burden of investigation to their insured, refusing to assist

12   him in getting his claim paid, despite their obligation to do so.

13   59.   Merrick persisted in attempting to get his claim paid without litigation until April

14   2000.

15   60.   At the first trial the jury determined that each Defendant had breached the

16   insurance contract.  This finding was affirmed on appeal.

17   61.   At the first trial the jury determined that each Defendant had not had a

18   reasonable basis to terminate Merrick's benefits or had otherwise acted

19   unreasonably in connection with the claim.  This finding was affirmed on appeal.

20   62.   At the first trial the jury determined that each Defendant's unreasonable claims

21   handling behavior had been engaged in knowingly or recklessly. This finding was

22   affirmed on appeal.

23   63.   At the first trial the jury determined that each Defendant had acted in bad faith.

24   This finding was affirmed on appeal.

25   64.   At the first trial the jury determined that each Defendant had acted with

26   oppression, fraud or malice.  This finding was affirmed on appeal.

27   65.   At the first trial the jury determined that Merrick suffered emotional distress as a

28   result of Defendants' bad faith conduct and compensated him in the amount of

- 20 -

1    $500,000 for which Defendants were jointly and severally liable.

2    66.   At the first trial the jury determined that Defendants breach of contract had

3          deprived Merrick of $1,147,355 in contract benefits for which Defendants were

4          jointly and severally liable.

5    67.   After the first trial Defendants started paying Merrick contract benefits, again

6          subject to a reservation of rights.

7    68.   As a measure of damage for loss of use and delay for accrued damages,

8          Defendants paid prejudgment interest of $550,173.69.

9    69.   Defendants paid recoverable costs of $19,214.54.

10   70.   Defendants paid $171,646.66 in post-judgment interest on the compensatory

11         damages.

12   71.   Under the post-trial reservation of rights Defendants paid Merrick an additional

13         $486,799 in contract benefits.

14   72.   The total actual and potential loss to Merrick as a result of Defendants' bad faith

15         conduct, including liability for breach of contract, in terms of money paid by

16         Defendants was $2,675,186.89.  When the first judgment is brought current to

17         the date of verdict in the second trial, it has a present value of $2,445,952.71.

18         Combined with the post-first-trial benefits, the total harm actual and expected to

19         Merrick as of the date of the second verdict was $2,932,751.71.

20   D.    Merrick's Claim Was Handled In Accordance With Defendants'
           Corporate Scheme

21
     That Defendants handled Merrick's claim in accordance with their corporate
22
     scheme is established throughout the evidence including:
23
24   73.   Attempting to classify Merrick's occupation as "unemployed" in an effort to deny

25         him benefits.  Ex. 174 at 186; Ex. 347.

26   74.   Asserting a reservation of rights on claim payments without a basis for doing so.

27         Ex. 174 at 279, Ex. 325 at 19, Ex. 326 at 12; Ex. 327 at 5.

28   75.   Twice attempting to force Merrick into accepting a low ball offer of settlement in

- 21 -

1      turn for a complete release of his claim or face the possibility of being sued for

2      benefits previously paid.  Ex. 174 at 279; Ex. 325 at 12, 19; Ex. 326 at 12, Ex.

3      327 at 5.

4    76.   Disregarding or cherry-picking inconsistencies in medical records to create a

5      pretext for claim termination, despite the uniformity of opinion from treating

6      physicians and evaluators that Merrick was substantially impaired.  Ex. 174 at

7      70, 153, 177; Ex. 235 at 10-11; Ex. 327 at 2.

8    77.   Not considering Merrick's condition or medical records as a whole, as reflected in

9      Defendants' selective reliance on portions of the Mayo Clinic's evaluation of

10     Merrick while ignoring the overall conclusion which was that Merrick in fact had

11     Chronic Fatigue Syndrome;

12   78.   Misrepresenting to Merrick that Defendants' own in-house evaluators had

13     determined that he was not substantially impaired, when, in fact, they concluded

14     he was.  Ex. 174 at 518, 519, 522-524, 525; Ex. 326 at 12, Ex. 327 at 3.

15   79.   Telling Merrick that his claim had to be denied because it was not supported by

16     objective evidence when there was no such requirement for claim payment in the

17     policy and Defendants knew that objective testing was not likely to show

18     impairment.  Ex. 174 at 343, 525, 536, 539, 611, Ex. 235 at 8; Ex. 326 at 9; Ex.

19     327 at 3; Ex. 348.

20   80.   Telling Merrick that he was not disabled under the policy from his own

21     occupation despite not having conducted any sort of investigation to establish

22     that the occupation of venture capitalist could be performed on a part time basis

23     in a low stress environment.

24   81.   Closing Merrick's claim on a rush basis in order to meet quarter end financial

25     goals, though Defendants had no evidence within their possession to support

26     such a claims decision on the merits.  Ex. 174 at 508; Ex. 326 at 11; Ex. 327 at 3.

27   82.   Shifting the burden of claim investigation to Merrick to come up with evidence

28     satisfactory to Defendants and then refusing to provide him any assistance with

1  respect to carrying that improperly imposed evidentiary burden. Ex. 174 at 519,

2  Ex. 235 at 8, Ex. 326 at 11; Ex. 327 at 5.

3  83.  Requiring Merrick to file suit, incur attorney fees and costs, and to go through

4  litigation in order to obtain the benefits to which he was entitled. Ex. 326 at 12;

5  Ex. 327 at 5.

6  84.  Further, it is not unreasonable to conclude that Merrick's claim was subjected to a

7  round table which was not documented. Merrick's claim involved a high

8  indemnity own occupation policy. Merrick's claim involved a "subjective

9  disability." While Merrick's claim was not new when the round tables were

10  brought to Revere, it was closed and he was seeking to have it reopened by

11  providing additional information. Under Defendants' "Best Practices

12  Recommendations" which were implemented with the Provident/Revere merger

13  there is every reason to believe that Merrick's claim was "roundtabled." Ex. 113

14  at 262.

15  All of the facts described above warrant this Court finding that Defendants'

16  conduct requires an award of substantial punitive damages to accomplish the dual

17  purposes of punishment and deterrence. Other facts described below support this

18  finding further.

19  E.  **Defendants Are Unrepentant With Respect To The Conduct**
    **They Directed At Merrick Or With Respect To Their Corporate**
20    **Scheme**

21  In the prior trial of the case the jury found that each Defendant had breached the

22  insurance contract in bad faith. The jury found that each Defendant had acted with

23  oppression, fraud or malice. These findings were affirmed on appeal. Despite these

24  jury determinations and judicial findings at the retrial Defendants:

25  85.  Asserted that they had done nothing wrong in the handling of Merrick's claim;

26  86.  Repeatedly insinuated that Merrick was not disabled.

27  87.  Asserted that the company(s) had never done anything wrong in handling any

28  claims.

- 23 -

a.  Defendants claimed that insurance regulators had found that they had not engaged in any form of misconduct towards any insured.  This position was demonstrably wrong and Defendants knew it.  The evidence established that investigators found widespread misconduct in Defendants' claims handling and that Defendants chose to enter into settlement agreements with regulators in order to avoid the formal findings of the very misconduct that they denied.  The evidence also established that they entered into these settlements to avoid additional financial and regulatory repercussions from their misconduct.  Ex. 235; 286; 327.

b.  Presented expert testimony concerning the regulatory process with respect to these Defendants which was simply not credible for several reasons.  Defendants' regulatory expert, Mr. Poolman, had no first-hand knowledge of the regulatory process as applied to these Defendants.  Mr. Poolman admitted that he did not participate in the process, did not know what documents, if any, beyond claim files, that examiners had access to, admitted that he had not even read most of the documents Defendants provided to him, and was seemingly unaware of other regulatory actions taken against Defendants by both the State of California and the State of Georgia.  Even Mr. Poolman's testimony concerning the Multistate regulatory process and how it was settled, the testimony which he was retained to provide, lacked credibility.

c.  Put on testimony of a witness, Kristine Bostek, who testified as to the good practices at the company, but who also admitted to being less than forthcoming in prior testimony, and who was less than forthcoming in her own testimony at trial as revealed by her denial of knowledge and impeachment over the Columbo award — an award Defendants gave to claim handling employees whose investigations led to the termination of claims.

-- 24 --

1       d.    Failed to present the testimony of a single current claims handling or

2                management level employee who could testify as to current practices at

3                the company or could testify that any of the types of bad faith conduct

4                evidenced in Merrick's claim file and in the institutional documents had

5                changed.

6       e.    Moreover any suggestion that things are different at the company now

7                was belied by evidence that certain regulatory settlements precluded

8                Defendants from being cited for regulatory violations during the claim

9                reassessment process, Ex. 346, and the fact that the high level

10              management of Defendants, who knew and participated in the institutional

11              bad faith practices, remain in place.  For example Thomas Watjen, who

12              was with Provident at the inception of Defendants' bad faith conduct, and

13              who was the head of its finance investment and legal organization at the

14              time of the merger with Revere, Ex. 188 at MERG 0047-48, was Vice-

15              Chairman of Executive Management after the merger with Revere, *Id.* at

16              MERG 0096, remains as the CEO of Unum Group.  Ex. 342 at 20, See

17              also, Ex. 286, 281, 188 at MERG 0089.

18     F.    **Defendants Refuse To Accept Responsibility For Their**

19           **Misconduct And Sought To Hide Their Misconduct Through Claims Of Privilege And Document Destruction**

20     Just as Defendants remain unrepentant, the evidence at trial established that in

21 seeking to avoid liability for punitive damages they were willing to manufacture a

22 defense designed to hide their misconduct as well as establishing corporate practices to

23 hide their misconduct on an ongoing basis.  The evidence which supports these factual

24 conclusions includes:

25    88.    Presenting statistical claims about corporate practices based not on statistics

26          generated in the regular course of business, but, rather, based on statistics

27          generated at the request of their trial counsel.  O'Connell Testimony.

28    89.    Presenting false testimony that they were returning their claimants to work when

1      they had no idea whether claimants who they classified as "return to work"

2      actually had done so. Testimony of Kathy Rutledge (rebuttal testimony).

3    90.   Claiming that a large number of resolutions were due to people returning to work

4      or as a result of company rehabilitation efforts when the evidence revealed that

5      at best, an insignificant portion of claimants benefitted from Defendants' return to

6      work/rehabilitation activities. In many of the corporate documents admitted at

7      trial dealing with claim resolutions, return to work/rehabilitation is not even

8      mentioned. Where mentioned and quantified, the statistics revealed it was of

9      little import to the overall claim resolution process.

10    91.   Claiming that their corporate policies were the result of consultants that they had

11      hired, when the evidence showed that they were already doing most of those

12      things the consultants recommended. Ex. 46.

13    92.   Having corporate policies designed to hide claim handling activities through

14      claims of attorney client privilege; Ex.6; Ex. 99.

15    93.   Having corporate policies designed to hide claim handling activities by either not

16      creating or destroying documents material to the claims handling process. Ex.

17      113; Ex. 325 at 20; Ex. 326 at 11; Ex. 327 at 4.

18    94.   As further evidence that Defendants refuse to accept responsibility for their own

19      conduct was their attempt, through their expert Robert DiLisio, to suggest that

20      Defendants' conduct was not bad, because other companies engaged in like

21      behaviors and practices. While the credibility of this testimony was challenged,

22      even if accepted it would not ameliorate to any significant degree the punitive

23      damages that are needed. Rather, as discussed below, such testimony if true

24      supports the need for a higher award of punitive damages to accomplish the

25      deterrent purpose of such awards.

26 **III.**    **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

27      The parties generally agree on the analysis that this Court must conduct of the

28 punitive damage awards at issue. The Court must consider the reprehensibility of

-- 26 --

1   Defendants' conduct, including considering ameliorative facts, the ratio between the

2   punitive damages awarded and the harm and potential harm suffered by the Plaintiff

3   and a comparison between the punitive damages awarded and any potential penalties

4   which were applicable to the conduct at issue. *BMW of North America v. Gore*, 517

5   U.S. 559, 575-585 (1996).

6        These standards have been addressed subsequently by the Supreme Court in

7   *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003), and several

8   decisions of the Ninth Circuit which control this Court's discretion. Much of this federal

9   punitive damage constitutional analysis is set forth in the Ninth Circuit's decision in *In re*

10  *Exxon Shipping*, 490 F.3d 1066 (9th Cir. 2007), *reversed on other grounds, Exxon*

11  *Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008). Of the three factors

12  identified in *BMW v. Gore*, reprehensibility is the most important one in determining

13  whether a punitive award is constitutionally excessive. *State Farm v. Campbell*, 538

14  U.S. at 419. Because reprehensibility is the most important factor, the Court starts its

15  analysis with assessing the reprehensibility of Defendants' conduct in this case.

16       A.     The Defendants Engaged In Highly Reprehensible Conduct

17  *State Farm v. Campbell's* reprehensibility analysis focused on five factors:

18  whether: the harm caused was physical as opposed to economic; the
    tortious conduct evinced an indifference to or a reckless disregard of the
19  health or safety of others; the target of the conduct had financial
    vulnerability; the conduct involved repeated actions or was an isolated
20  incident; and the harm was the result of intentional malice, trickery, or
    deceit, or mere accident.

21  538 U.S. at 419. Subsequently, in *Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128
22
    S.Ct. 2605, 2622 (2008), the Court recognized that misconduct engaged in to obtain
23
    financial gain or augment profit was highly culpable deserving greater punishment.
24
         1.     Defendants Engaged To Misconduct To Augment Profits
25
         In this case, all of Defendants' misconduct, both directed at Merrick and at their
26
    disabled insureds at large as described in §§ II A-D, warrants the conclusion that
27
    Defendants engaged in the conduct at issue in this case to augment their profits and to
28

1    obtain improper financial gains.  The evidence also establishes that such conduct was

2    successful and that Defendants have reaped hundreds of millions of dollars if not more

3    in benefit from engaging in the conduct.  § II.B.  No award that his Court can make will

4    force Defendants to disgorge all the improper profits that they obtained.  As described

5    below, these profits were obtained at the expense of physically, mentally, emotionally,

6    and economically vulnerable individuals, through repeated actions systematically

7    applied to deprive them of disability insurance benefits in their time of need.

8    Defendants have engaged in such conduct both with respect to Merrick and to their

9    other insureds for an extended period of time.  Such conduct leads to the conclusion

10   that these Defendants engaged in highly reprehensible conduct.

11                    **2.    Defendants' Conduct Caused More Than Economic Harm**

12        Both the Supreme Court in *BMW* and the Ninth Circuit in *Exxon* and other cases

13   have recognized that conduct which causes emotional as well as economic harm is

14   more reprehensible than that which causes only economic harm. *BMW v. Gore*, 517

15   U.S. at 576, n. 24; *In re Exxon Valdez*, 490 F.3d at 1085-86.  In *State Farm v.*

16   *Campbell*, after remand, the Utah Supreme Court found that insurance bad faith, and

17   the emotional distress it causes, is more akin to a physical assault than a pure

18   economic tort and remitted the punitive damages to a 9:1 ratio.  The Supreme Court

19   then denied further review. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 2004

20   UT 34, 98 P.3d 409, 415 (Utah 2004), *cert. denied*, 593 U.S. 874, 125 S.Ct. 114 (2004).

21   Nevada law also recognizes that the tort of insurance bad faith goes beyond a mere

22   economic offense because it deprives the insured of the bargained for consideration,

23   peace of mind. *Ainsworth v. Combined Ins. Co.*, 763 P.2d at 673, 677, *cert. denied*, 493

24   U.S. 958 (1989).

25        Merrick in fact suffered substantial emotional distress and there is no reason to

26   doubt that other insureds, subjected to the same misconduct also suffered significant

27   emotional distress.  This Court may certainly consider such harm to others in

28   determining the reprehensibility of Defendants' conduct.  *In re Exxon*, 490 F.3d at 1087.

- 28 -

3.   **Defendant's Conduct Risked the Health and Safety of Merrick and Others**

Virtually any disabled individual is at risk of harm to their health and safety if a disability insurance carrier deprives them of their benefits. Such contracts are entered into for the purpose of protecting peace of mind, as well as financial assets, in times of need. *Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, 456, *modified on rehearing*, 622 P.2d 411 (Cal. 1979), *accord, Ainsworth, supra* (health insurance). The type of risks to health and safety that insureds may suffer when their benefits are cut off are described in some detail in the district court's opinion in *Hangarter v. Paul Revere Life Ins. Co.*, 236 F.Supp.2d 1069, 1096-97 (N.D. Cal. 2002), *affirmed in part, reversed in part* 373 F.3d 998 (9th Cir. 2004).

Merrick himself was similarly at risk. At the time of Defendants' second visit to Merrick, his teenage son had recently died. Merrick's adult daughter had terminal cancer and he was supporting her economically. He was supporting his father. At a time of high emotional vulnerability Defendants attempted to settle Merrick's claim for two months of payments and a threat of litigation. When he refused their low-ball settlement offer, Defendants terminated benefits adding to his emotional stress. While Merrick had financial resources that he could turn to, the need to use funds otherwise committed for day to day expenses was stressful.

4.   **Defendants Targeted The Financially Vulnerable**

All of the evidence discussed in §§ II.A-B *supra* suggests that Defendants targeted their financially vulnerable insureds. Exhibits 44 and 75 demonstrate that Defendants' targeted individuals such as Merrick in part because their illnesses often left them vulnerable to pressure that Defendants could bring to bear upon them to "achieve some type of resolution." That Defendants sought to take advantage of this is reflected in their unsuccessful efforts to settle Merrick's claims for minimal amounts while threatening litigation to obtain previous payments, §§ II.A, C, D.

While Merrick himself was not left destitute, he felt financial stress when he became disabled and then when Defendants terminated his benefits. As a result of his

Case 2:17-cv-01509-RFB-PAL   Document 1-1   Filed 05/26/17   Page 50 of 75

1   disability he had left his occupation and was forced to scale back his standard of living.

2   Faced with the denial of benefits, he reached into savings and investments for which he

3   had other purposes, to meet current obligations such as supporting his own father, his

4   terminally ill daughter, and to aid in the support, along with others, of Young Mee

5   Jeong, who would later become his wife. § II.C.

6        *In re Exxon* again teaches that when assessing reprehensibility the Court can

7   also consider the risk of harm to others when the conduct at issue was putting them at

8   risk too. There is little doubt that Defendants' conduct directed at others was directed

9   at the financially vulnerable. Again, a taste of that vulnerability is reflected in the district

10   court's opinion in *Hangarter, supra*. Some lose their homes; some are forced on to

11   welfare; some are forced into bankruptcy. That these consequences did not happen to

12   Merrick is a matter of fortuity and not the result of Defendants taking steps to avoid

13   harming their disabled insureds.

14        **5.**    **Repeated Action**

15        Just as there is no doubt that Defendants engaged in their misconduct for

16   financial gain, there is absolutely no doubt that they repeatedly engaged in misconduct

17   with respect to both Merrick and their other insureds. §§ II.A-D.

18        The testimony and exhibits concerning Defendants' use of "unemployed" as an

19   occupation left no doubt that it was a technique repeatedly employed to defeat claims

20   regardless of its lack of contractual or legal merit.

21        Defendants repeatedly engaged in misconduct towards Merrick through such

22   means as the low-ball settlement offers with threats of litigation, asserting reservations

23   of rights and maintaining them without good cause, misrepresenting that medical

24   reviewers had not found impairment when they actually had, repeatedly

25   misrepresenting that objective evidence was required to obtain claim payment when it

26   was not a requirement of the policy and Defendants knew it could not exist in light of

27   Merrick's illness, refusing to assist Merrick in getting his claim paid, shifting the burden

28   of investigation to Merrick, and closing his claim without cause on a rush basis to meet

- 30 -

1   monthly, quarterly and/or year-end goals.

2       Further, the evidence discussed in §§ II.A, B, D further establishes that the

3   conduct directed towards Merrick was not the result of accident or inadvertence, but

4   was part of a widespread corporate plan or scheme to augment profits through wrongful

5   conduct targeted at disabled policyholders.  Defendants' claims and testimony that

6   there was no such corporate plan were simply not credible in light of the overwhelming

7   documentary evidence establishing that such a plan existed and was transmitted

8   through all levels of the company from claims handlers to the board room.

9       Based on the evidence introduced at trial and taking into account matters of

10   credibility, the only conclusion to be drawn is that Defendants engaged in a widespread

11   corporate plan, and conscious course of corporate conduct firmly grounded in

12   established company policy, to disregard Merrick's rights and the rights of tens of

13   thousands, if not hundreds of thousands of other policyholders.  Defendants'

14   misconduct indeed involved repeated action.  The length of time and thousands of

15   individuals against whom Defendants improperly acted adds additional weight to the

16   conclusion that Defendants' misconduct reaches the highest levels of reprehensibility.

17       **6.    Defendants Acted With Malice, Trickery Or Deceit And Not By
         Accident**

18

19       Based on the evidence discussed at §§ II.A-B, there is no doubt that Defendants

20   acted consciously and deliberately and not by accident when they established and then

     drove their new claim handling philosophy deep into their corporate culture.  Ex. 95.
21

22       With respect to Merrick's claim, which was handled in accord with Defendants'

23   corporate scheme the evidence discussed in §§ II.C and D, clearly establishes that

24   Defendants acted maliciously, attempted to trick Merrick into giving up his claim for a

25   minimum settlement and acted deceitfully through intentional misrepresentation.

     Defendants deliberately misrepresented what their own evaluators concluded and knew
26
     in their attempt to attain a settlement of the claim.  Defendants threatened Merrick with
27
     litigation if he did not give up his claim.  Defendants misrepresented repeatedly that he
28

1   needed to provide objective evidence to get his claim paid.  Defendants made these

2   misrepresentations knowing that such evidence did not exist with respect to Merrick's

3   disability.  Despite knowing that it was their burden to fairly investigate claims,

4   Defendants put the burden of claims investigation on their disabled insureds, including

5   Merrick, and then refused to assist him when he sought assistance from them in order

6   to fulfill the improperly shifted investigatory burden.

7       The credible evidence introduced at trial, clearly establishes that Defendants

8   acted intentionally and maliciously both with respect to the establishment of bad faith

9   claims practices in general, and with respect to Merrick's claim in particular.

10      As the Ninth Circuit noted in *Exxon,* the *BMW/Campbell* guideposts should not

11  become an intellectual straight jacket.  490 F.3d at 1083.  The parties recognize this

12  and both Defendants and Plaintiff argue additional facts in support of their respective

13  positions.  The Court agrees with those positions asserted by Plaintiff and disagrees

14  with those asserted by Defendants.

15      Defendants' lack of repentance, refusal to acknowledge responsibility, attempts

16  to hide their misconduct from discovery, and presentation of false and misleading

17  evidence to the jury all suggest a need for greater punishment and deterrence and add

18  to the sense that Defendants' conduct is highly reprehensible.

19      Similarly, it appears that prior punitive damage awards have been insufficient to

20  either punish or deter.  Considering what defendants have gained as reflected in § II.B,

21  it is little wonder.

22      Defendants' attempts to justify their conduct through their expert Robert DiLisio,

23  by suggesting that all companies do what the evidence shows these Defendants did,

24  does not, in the Court's view, ameliorate the reprehensibility of the misconduct.  If

25  anything, such evidence tends to suggest that a strong message needs to be sent to

26  validate Nevada's interest in both punishing these Defendants and deterring them and

27  others from acting in the same way in the future.

28      Against these other factors Defendants posit that their payment of Merrick's claim

- 32 -

1   prior to merger and after accepting liability without reservation should be counted in their

2   favor.  It is not because such conduct was a contractual obligation.  Defendants' second

3   claim that they paid benefits after terminating Merrick's claim is true.  But the Court

4   rejects Defendants' claim of innocent and good faith motives.  Defendants at the time

5   they agreed to extend benefits for two months had already breached the contract, had

6   already lied to Merrick about what medical reviewers found, what evidence was required

7   to obtain claim payment and had already shifted the burden of investigation to Merrick, a

8   burden they knew he could not meet.  In light of these facts, the Court agrees with

9   Plaintiff that the later payment of benefits was simply a tactical move by Defendants to

10  obscure their misconduct.  Lastly, the Court rejects the Defendants' assertion that their

11  position was "hardly arbitrary" and therefore reflected lower reprehensibility.  The Court

12  agrees the conduct was hardly arbitrary, but not in the way the Defendants would prefer.

13  The evidence clearly established that Defendants' misconduct directed towards Merrick

14  was intentional and deliberate.  Defendants' misconduct was not just the result of

15  arbitrary action; rather, it was intentional misconduct aimed at obtaining financial gain at

16  the expense of their disabled insured.  Such conduct was and is highly reprehensible.

17          7.      Reprehensibility Conclusion

18          Based on the Court's reprehensibility analysis it concludes that the Defendants

19  intentionally engaged in misconduct towards Merrick and thousands of others for their

20  own financial gain.  The Court further concludes that Defendants deliberately targeted

21  those who were physically, mentally, emotionally, and financially vulnerable.  The Court

22  concludes Defendants repeatedly subjected Merrick and thousands of others to their

23  bad practices and subjected hundreds of thousands to the risk of those bad practices.

24  Finally, the Court concludes that Defendants acted maliciously with trickery and deceit

25  towards Merrick and thousands of others of their insureds and again subjected hundreds

26  of thousands of insureds to the risk of their misconduct.  Defendants did not act by

27  accident.  The Court concludes that the reprehensibility of Defendants conduct requires

28  punishment at the highest levels constitutionally permissible.

1     **B.**    **Ratio**

2        The Court's ratio analysis will be governed by the analytic "rough framework" laid

3    out by the Ninth Circuit in the *Exxon* case.

4          In *Planned Parenthood*, we used this guidance from *State Farm* to
          construct a "rough framework" for determining the appropriate ratio

5          of punitive damages to harm. *See* 422 F.3d at 962. We held that in
          cases where there are "significant economic damages" but behavior

6          is not "particularly egregious," a ratio of up to 4 to 1 "serves as a
          good proxy for the limits of constitutionality." *Id.* (citing *State Farm*,

7          538 U.S. at 425, 123 S.Ct. 1513). In cases with significant economic
          damages and "more egregious behavior," however, a single-digit

8          ratio higher than 4 to 1 "might be constitutional." *Id.* (citing *Zhang*,
          339 F.3d at 1043-44; *Bains*, 405 F.3d at 776-77). Finally, in cases

9          where there are "insignificant" economic damages and the behavior
          is "particularly egregious," we said that "the single-digit ratio may not

10         be a good proxy for constitutionality." *Id.*

11   490 F.3d at 1093. This case clearly falls within the second tier of that framework.

12   Merrick clearly suffered significant economic loss and Defendants' conduct was highly

13   reprehensible. Defendants claim that the ratio should be reduced because of their prior

14   payments to Plaintiff and the regulatory settlements. The Court disagrees that these

15   require any reduction with respect to Revere, or any substantial reduction not otherwise

16   given under the Ninth Circuit's framework with respect to UnumProvident. Defendants'

17   prior payments of what they owed were made only after they were found liable for bad

18   faith. Defendants' payments after the first trial were made pursuant to reservation of

19   rights, a reservation which was not removed even after the Ninth Circuit affirmed the

20   breach of contract and bad faith findings, and the findings that Defendants acted with

21   oppression, fraud or malice. Defendants' payment of the underlying judgment does not

22   ameliorate their misconduct. They had no basis not to pay. Defendants remain

23   unrepentant and continue to refuse to accept responsibility for their misconduct. They

24   get no credit for their prior payments.

25        The Regulatory Settlement Agreements are also entitled to little credit in terms of

26   reducing the permissible ratio. Defendants entered such settlements for their own

27   financially motivated reasons. Defendants as reflected in the testimony they offered at

28   trial continue to deny any wrongdoing. As Defendants have never acknowledged or

1   taken responsibility for their misconduct, skepticism is appropriate.

2          Further, the regulatory settlements did not deprive Defendants of their ill-gotten

3   gains to any substantial degree.  Even though Defendants have been forced to post

4   additional reserves to cover those claims that they agreed to reopen, they maintain

5   control of those funds and the earnings they generate from them.  Similarly, Defendants

6   have not even attempted to fully compensate those harmed by their misconduct, and, in

7   fact, required individuals who had their claims reopened to waive their rights to full

8   redress.  Ex. 350.  These facts take something away from the ameliorative impact that

9   the Regulatory Settlement Agreements might have had—as the jury so concluded.

10  Additionally, the finding of no violations on the California reassessment was simply in

11  keeping with the prior settlement and has no particular value with respect to reducing

12  the appropriate ratio.  The regulatory settlements therefore have no particular value with

13  respect to punishment.  With respect to deterrence, the effects of the changes remain

14  to be seen.

15         The conduct of Defendants is highly reprehensible without substantial

16  ameliorative behavior on their part.  It was engaged in for profit and targeted thousands

17  of vulnerable individuals and put hundreds of thousands at risk.  It was repeated, and

18  involves malice, trickery and deceit and is not the product of accident.  Under these

19  circumstances a punitive ratio of up to 9:1 is not only appropriate, it is that which is

20  minimally necessary to meet Nevada's legitimate goals of punishment and deterrence

21  in light of the reprehensibility of the conduct and the wealth of the Defendants.[21]

22         Just as the parties dispute what the appropriate ratio is, they dispute how it

23
    [21]
24  _See State Farm v. Campbell_, 538 U.S. at 427; _BMW of North America v. Gore_, 517 U.S.
    at 591 (Breyer, J. concurring).  Here the amounts awarded by the jury are less than
25  0.45% of UnumProvident's net worth, Exhibit 342, and less than 2.4% of Revere's net
    worth. Ex. 341.  These percentages of net wealth as a measure of appropriate level of
26  punishment are well within ranges approved by the Nevada Supreme Court and are not
    so punishing as to be constitutionally excessive.  _Wohler's v. Bartgis_, 114 Nev. at 1268-
27  1269, 949 P.2d at 962 the Nevada Supreme Court, in reducing punitive awards remitted
    one to an amount that was approximately 6.2% of the defendant's net worth.
28

                                    - 35 -

1   should be calculated. The Court agrees with Plaintiff; the ratio needs to be calculated

2   with respect to each Defendant separately. *BMW of North America v. Gore*, 517 U.S. at

3   575; *Bell v. Clackamas County*, 341 F.3d 858, 867-868 (9th Cir. 2003); *Albert H.*

4   *Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1267-69, 969 P.2d 949, 961-62 (Nev. 1998)

5   (in bad faith case jury made separate punitive damage awards against separate

6   defendants and appellate court engaged in individualized assessment of each such

7   award). Defendants were jointly and severally liable without apportionment for the

8   underlying harm their conduct caused, as found by the prior verdicts and judgments in

9   this case. It is inappropriate to apportion the harm between the two Defendants. As

10  *Wohlers, supra,* demonstrates, that is Nevada law.

11      As to what the denominator should be in the ratio of punitive damages / actual

12  and potential harm, the Court also agrees with Plaintiff. The appropriate denominator

13  consists of the first trial judgment brought to present value to which should be added

14  the post-trial benefits paid to Merrick under reservation of rights. This figure is

15  $2,932,751.71. It is comprised of the prior judgment amount of $2,216.00, 743.23

16  brought current to the date of the verdict at 8.3% compounded annually plus the

17  $486,799 in post first trial benefit payments.

18      Using these amounts the ratio as to Paul Revere is $24,000,000 / $2,932,751.71

19  = 8.18:1. Under the facts of this case this ratio is not constitutionally excessive.

20      As to UnumProvident, the ratio is $36,000,000 / $2,932,751.71 = 12.28:1. Under

21  the facts of this case, but for the Ninth Circuit's "rough framework" this ratio would not be

22  constitutionally excessive as it does not significantly exceed a single digit ratio and the

23  Defendants' conduct was reprehensible. It involved misconduct undertaken to augment

24  profit, targeted at the physically, mentally, emotionally, and financially vulnerable. It

25  involved repeated instances of misconduct deliberately, intentionally, maliciously,

26  engaged in with trickery and deceit. It involves conduct for which Defendants remain

27  unrepentant and refuse to accept responsibility. It involves deliberate attempts to hide

28  the misconduct. Nonetheless, the judgment against UnumProvident must be reduced to

1   a ratio of no more than 9:1.  Scaling back the ratio also gives UnumProvident some

2   credit for the ameliorative impact, if any, of the regulatory settlement agreements and

3   prior payments.

4        It should be noted that Defendants have not attempted to fully compensate those

5   injured by their conduct and in fact, conditioned payment on the underlying contractual

6   benefits on individuals giving up their right to full compensation.  Exhibit 350.  Similarly,

7   though Defendants have had to post additional reserves, Exhibit 612, they maintain

8   control of those Reserve funds and continue to earn income and profits from them.  In

9   sum, Defendants continue to profit from their improperly obtained gains.

10       The Court finds the conduct of Revere equally reprehensible to that of

11  UnumProvident.  It does not find that the change in the ratio with respect to

12  UnumProvident causes the Revere ratio to cause grossly disproportionate punishment

13  between the two Defendants.

14       C.    Comparable Penalties

15       The last *BMW/Campbell* factor to address is the matter of civil penalties.  As

16  reflected in the Ninth Circuit's *Exxon* opinion, the Court need not dwell on this factor

17  because it is of little importance.[22]  Further, what is clear is that the Nevada legislature

18  considers insurance bad faith a serious matter, and that it recognizes that substantial

19  punitive damages are necessary to punish and deter such conduct.  The legislature

20  specifically chose not to impose statutory caps on punitive damages for insurance bad

21  faith.  NRS 42.005 (2)(b); NRS 42.007(2).  Such an exception, in the face of a prior

22  Nevada Supreme Court case approving punitive damage ratios approaching 30:1,

23  *Ainsworth supra,* suggests that, but for the Ninth Circuit's "rough framework" ratio

24  analysis, the current awards as to both Revere and UnumProvident are constitutionally

25  permissible.

26  . . .

27

28

---

[22] 490 F.3d at 1094.

D.      Miscellaneous Contentions

The Court concludes its decision addressing briefly the other matters raised by Defendants, and addressed by Plaintiff in response.

The Court agrees with Plaintiff that in adopting the *BMW/Campbell* analysis in *Bongiovi v. Sullivan*, 122 Nev. 556, 138 P.3d 433, 452 (2006), the Nevada Supreme Court did so as a matter of judicial economy. All the facts which support the constitutional propriety of that verdict and judgment also support the conclusion it is not excessive under Nevada law. Because the verdict as to Revere falls within the *BMW/Campbell* analysis as interpreted by the Ninth Circuit, the verdict and judgment are not excessive under Nevada law.

With respect to UnumProvident, the Court specifically finds that the verdict and judgment as entered would not be excessive under Nevada law, as the amounts returned in terms of ratio and wealth of the defendant are well within parameters set by the Nevada Supreme Court in *Ainsworth* and *Wohlers*, involving conduct substantially less egregious, and in the case of *Wohlers* substantial voluntary efforts at amelioration and compensation.

Finally, the Court rejects the notion that the Nevada Supreme Court would adopt as a rule of decision the maritime law 1:1 ratio recently announced by the Supreme Court in *Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008). First, the Court expressly stated in its opinion that its decision was not addressing constitutional issues. Second, the Nevada legislature has expressly rejected ratio or dollar caps on punitive damages in insurance bad faith cases. In light of this action, the Nevada Supreme Court would not adopt limits more restrictive than those rejected by the legislature. Finally, the Nevada Supreme Court has previously approved ratios approaching 30:1 in insurance bad faith cases. Nothing suggests that the Court would not approve such ratios again if constitutionally permissible.

...

...

IV.   CONCLUSION

For the reasons set forth herein, Defendants' Motion for New Trial, Remittitur or Reduction of Punitive Damages, Document No. 514 is granted in part and denied in part. As to Defendant Paul Revere Life Insurance Company the Motion is DENIED. As to Defendant UnumProvident Corporation the Motion is granted as follows:

The Court hereby reduces the punitive damages against UnumProvident on constitutional grounds to the amount of $26,394,765.39, a ratio of 9:1. The Clerk of Court is directed to vacate the prior judgment at Document No. 512. Because the reduction of this punitive damage award against UnumProvident on constitutional grounds does not implicate the Seventh Amendment,[28] the Clerk of Court is further directed to prepare an amended judgment that includes all amounts in the prior judgment except with a punitive damages award against UnumProvident in the amount of $26,394,765.39 rather than $36,000,000.00.

IT IS SO ORDERED.

DONE this 14th day of November, 2008.

James C. Mahan
United States District Court Judge

---

[28] See, e.g., Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999); Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 285 F.3d 1146, 1151 & n.3 (9th Cir. 2002).

-- 39 --

# EXHIBIT G

# EXHIBIT G

# DISTRICT COURT CIVIL COVER SHEET

Clark County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

**A-17-754121-C**
**XIV**

## I. Party Information *(provide both home and mailing addresses if different)*

| Plaintiff(s) (name/address/phone): | Defendant(s) (name/address/phone): |
|---|---|
| Mary Jean Lambert | Hartford Underwriters Insurance Company |
| | |
| | |
| Attorney (name/address/phone): | Attorney (name/address/phone): |
| Scott S. Poisson Esq.  702-256-4566 | Unknown |
| 320 S. Jones Blvd | |
| Las Vegas, NV 89107 | |

## II. Nature of Controversy *(please select the one most applicable filing type below)*

### Civil Case Filing Types

| Real Property | Torts | |
|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** |
| ☐ Unlawful Detainer | ☑ Auto | ☐ Product Liability |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort |
| ☐ Other Title to Property | ☐ Medical/Dental | ☐ Other Tort |
| **Other Real Property** | ☐ Legal | |
| ☐ Condemnation/Eminent Domain | ☐ Accounting | |
| ☐ Other Real Property | ☐ Other Malpractice | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** *(select case type and estate value)* | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Foreclosure Mediation Case |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Petition to Seal Records |
| ☐ Special Administration | **Contract Case** | ☐ Mental Competency |
| ☐ Set Aside | ☐ Uniform Commercial Code | **Nevada State Agency Appeal** |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Department of Motor Vehicle |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Worker's Compensation |
| **Estate Value** | ☐ Commercial Instrument | ☐ Other Nevada State Agency |
| ☐ Over $200,000 | ☐ Collection of Accounts | **Appeal Other** |
| ☐ Between $100,000 and $200,000 | ☐ Employment Contract | ☐ Appeal from Lower Court |
| ☐ Under $100,000 or Unknown | ☐ Other Contract | ☐ Other Judicial Review/Appeal |
| ☐ Under $2,500 | | |

| Civil Writ | | Other Civil Filing |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☐ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil coversheet.*

4/17/17
Date

Signature of initiating party or representative

*See other side for family-related case filings.*

Electronically Filed
04/17/2017 04:46:52 PM

*[signature]*

**CLERK OF THE COURT**

**COMP**
Scott Poisson, Esq.
Nevada Bar # 10188
Christopher Burk, Esq.
Nevada Bar # 8976
320 South Jones Blvd.
Las Vegas, NV 89107
Telephone:  (702) 256-4566
Facsimile:  (702) 256-6280
Chris@vegashurt.com
Attorneys for Plaintiff

# DISTRICT COURT

# CLARK COUNTY, NEVADA

Mary Jean Lambert,

               Plaintiff,

vs.

Hartford Underwriters Insurance Company
an entity licensed to do business in Arizona
and Nevada; DOES 1 through 10; XYZ
CORPORATIONS 11 through 20; and ABC
LIMITED LIABILITY COMPANIES 21
through 30, inclusive,

               Defendants.

CASE NO.: A-17-754121-C
DEPT NO.:   XIV

*Bernstein & Poisson*
*320 S. Jones Blvd.*
*Las Vegas, Nevada 89107*
*OFFICE: (702) 256-4566  FAX: (702) 256-6280*

COMES NOW Plaintiff, Mary Jean Lambert, by and through her counsel, SCOTT POISSON, ESQ. and CHRISTOPHER D. BURK, ESQ. of BERNSTEIN & POISSON, and for her causes of action against Defendants, and each of them, complains and alleges as follows:

///
///
///
///

-1-

**GENERAL ALLEGATIONS**

1.     Plaintiff Mary Jean Lambert ("Plaintiff") is, and at all relevant times was, an individual residing in Clark County, Nevada.

2.     Defendant, Hartford Underwriters Insurance Company (hereinafter "Defendant Hartford"), is the Plaintiffs' Underinsured/Uninsured Motorist Insurance Company that was in full force and effect on April 11, 2012.

3.     The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of Defendants Does 1 through 10, XYZ Corporations 11 through 20 and ABC Limited Liability Companies 21 through 30 ("Does/XYZ/ABC"), inclusive, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, Plaintiff will amend this Complaint accordingly.

4.     On information and belief, Does/XYZ/ABC participated in the ownership, management, control, entrustment, supervision, execution, driving, and/or provision of the services and actions involved in this action; Does/XYZ/ABC include, but are not limited to, owners, operators, managers, supervisors, employers, contractors, insurers, governmental authorities, and their agents, servants, representatives, employees, partners, joint venturers, related companies, subsidiaries, parents, affiliates, predecessors, and/or successors in interest.

5.     On information and belief, Does/XYZ/ABC are responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiff as hereinafter alleged.

6.     On information and belief, Does/XYZ/ABC were involved in the initiation, approval, support or execution of the wrongful acts upon which this litigation is premised, or of similar actions against them of which the Plaintiff is presently unaware. On information and belief, at all times herein mentioned, certain of the Defendants acted as the agent, servant, representative, employee, partner, and/or joint venturer of certain other Defendants, and at all said times were acting in the full course and scope of said agency, service, representation, employment, partnership, and/or joint venture.

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280

7.   On April 11, 2012, Plaintiff was injured in a car crash due to the negligence of another driver.

8.   The Plaintiff's vehicle was totaled in the crash on April 11, 2012.

9.   In the crash on April 11, 20112, the Plaintiff suffered injuries to her Neck, Shoulders, Right Arm and Headaches.

10.   Plaintiff was, at all relevant times, insured under a policy for medical payments coverage automobile insurance issued by Defendant Hartford.

11.   Plaintiff was, at all relevant times, insured under a policy for underinsured/uninsured motorist coverage automobile insurance issued by Defendant Hartford for $250,000 per person and $500,000 per occurrence.

12.   Plaintiff was, at all relevant times, insured under a policy for underinsured/uninsured umbrella motorist coverage automobile insurance issued by Defendant Hartford for $1,000,000 per person/per occurrence.

13.   Due to the crash on April 11, 2012, Plaintiff has incurred over $70,000 in medical bills.

14.   Due to the crash on April 11, 2012, Plaintiff now has a permanent injury to her cervical area.

15.   The crash on April 11, 2012 caused and aggravated injuries to Plaintiff's cervical area.

16.   Plaintiff has future medical bills and pain and suffering damages and breach of contract damages in an amount in excess of her underinsured/uninsured and umbrella policy limits.

17.   Despite the amount of these medical expenses, and receipt of medical records to prove the amount, Defendant Hartford has denied this claim and refuses to authorize any settlement, even though a policy limit offer would still be insufficient to cover all of Plaintiff's expenses.

18.   The undersigned first contacted Defendant regarding the uninsured/underinsured motorist coverage in February 2014.

**Bernstein & Poisson**
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566 FAX: (702) 256-6280

19.   Correspondence between Plaintiff and Defendant has continued for years until the Defendant denied the entire undersinsured/uninsured motorist claim.

20.   Defendant breached the contract and acted in bad faith by denying this righteous and valid claim.

21.   Due to this denial of the claim, Plaintiff brings this lawsuit.

## FIRST CAUSE OF ACTION

**(Breach of Contract – Against Hartford for UM/UIM, Umbrella and Medical Payment Coverage Denials)**

22.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 as though fully set forth herein.

23.   Plaintiff entered into a valid contract, the Hartford Policy, with Defendant Hartford, wherein Defendant Hartford agreed to, among other things, provide uninsured/underinsured motorist coverage in the amount of $230,000.00 for each person and an additional $1,000,000 per person as an umbrella policy.

24.   Plaintiff fully performed all her duties under the Hartford Policy.

25.   On or about April 11, 2012, Plaintiff was an uninsured/underinsured motorist as defined in the Hartford Policy.

26.   Defendant Hartford breached the Hartford Policy by, among other things, refusing Plaintiff the compensation due under the uninsured/underinsured coverage provisions.

27.   As a direct and proximate result of Defendant Hartford's breach of the Hartford Policy, Plaintiff is entitled to recover damages in excess of $15,000.00.

28.   Plaintiff has been required to retain the services of counsel to prosecute this matter, and, as such, are entitled to an award of costs and reasonable attorneys' fees incurred herein.

///

///

///

///

**Bernstein & Poisson**
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566   FAX: (702) 256-6280

## SECOND CAUSE OF ACTION

### (Contractual Breach of Implied Covenant and Good Faith and Fair Dealing - Against Hartford for UM/UIM, Umbrella and Medical Payment Coverage Denials))

29.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 28 as though fully set forth herein.

30.     Implied in every contract in the State of Nevada is a covenant of good faith and fair dealing that requires the parties to act fairly and in good faith with each other.

31.     Defendant Hartford breached its duty of good faith and fair dealing by, among other things, refusing Plaintiff any underinsured motorist compensation due under the uninsured/underinsured coverage provisions.

32.     Plaintiff has been damaged by Defendant Hartford's breaches of the implied warranty of good faith and fair dealing in an amount in excess of $15,000.00.

33.     Plaintiff has been required to retain the services of counsel to prosecute this matter, and, as such, are entitled to an award of costs and reasonable attorneys' fees incurred herein.

## THIRD CAUSE OF ACTION

### (Tortious Breach of Implied Covenant of Good Faith and Fair Dealing - Against Hartford for UM/UIM, Umbrella and Medical Payment Coverage Denials)

34.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 33 as though fully set forth herein.

35.     Implied in every contract in the State of Nevada, including the Hartford Policy, is a covenant of good faith and fair dealing that requires the parties to act fairly and in good faith with each other.

36.     Defendant Hartford owed a duty of good faith and fair dealing to Plaintiff.

37.     There was a special element of reliance between Plaintiff and Defendant Hartford where Defendant Hartford was in a superior or entrusted position.

**Bernstein & Poisson**
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280

38.     Defendant Hartford breached the Hartford Policy's covenant of good faith and fair dealing by, among other things, refusing Plaintiff full compensation due under the uninsured/underinsured coverage provisions.

39.     Defendant Hartford's breach of the Hartford Policy covenant of good faith and fair dealing was tortious because it was oppressive, fraudulent, and/or malicious.

40.     Because Defendant Hartford's tortious breach of the Hartford Policy covenant of good faith and fair dealing was oppressive, fraudulent, and/or malicious, Plaintiff is entitled to punitive and/or exemplary damages.

41.     Defendant Hartford has violated several provisions of Nevada law, among other things, failing to acknowledge and act with reasonable promptness in response to communications from Plaintiff, and failing to effectuate prompt, fair and equitable settlements of Plaintiff's claims and/or wrongfully denying this claim.

43.     Plaintiff has been damaged by Defendant Hartford's unfair practices in an amount in excess of $15,000.00.

44.     Plaintiff has been required to retain the services of counsel to prosecute this matter, and, as such, is entitled to an award of costs and reasonable attorneys' fees incurred herein.

45.     Implied in every contract in the State of Nevada, including the Hartford Policy, is a covenant of good faith and fair dealing that requires the parties to act fairly and in good faith with each other.

46.     Defendant Hartford owed a duty of good faith and fair dealing to Plaintiff.

47.     There was a special element of reliance between Plaintiff and Defendant Hartford where Hartford was in a superior or entrusted position.

48.     Defendant acted in bad faith regarding its obligations to provide insurance coverage by refusing Plaintiff full compensation due under the uninsured/underinsured coverage provisions of the Hartford Policy.

49.     Plaintiff's justified expectations were thus denied.

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280

50.    As a direct and proximate result of Defendant's bad faith actions, Plaintiff has been damaged in an amount in excess of $15,000.00.

51.    As Defendant's multiple bad faith actions as outlined above were oppressive, fraudulent and/or malicious, Plaintiff is entitled to punitive and/or exemplary damages.

52.    Plaintiff has been required to retain the service of an attorney to prosecute this action and is entitled to recovery reasonable attorney's fees and costs incurred herein.

## FOURTH CLAIM FOR RELIEF

## (UNFAIR CLAIMS PRACTICES - Against Hartford for UM/UIM, Umbrella and Medical Payment Coverage Denials)

1.    Plaintiffs hereby incorporate by reference paragraphs 1 through 52 as if fully set forth herein at length.

2.    That Defendant Hartford failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under Plaintiffs' insurance policy, as prohibited by NRS 686A.310(1)(b).

3.    That Defendant Hartford failed to effectuate a prompt, fair, and equitable settlement of claims in which its liability had become reasonably clear, as prohibited by NRS 686A.310(1)(e).

4.    That Defendant Hartford failed to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been completed and submitted by the insured, as prohibited by NRS 686A.310(1)(d).

5.    That Defendant Hartford compelled Plaintiffs to institute litigation to recover amounts due under the applicable insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the Plaintiffs, when the Plaintiffs made claims for amounts reasonably similar to the amounts ultimately recovered, as prohibited by NRS 686A.310(1)(f).

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566   FAX: (702) 256-6280

6.      That Defendant Hartford attempted to settle a claim made by Plaintiffs for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material or accompanying or made part of an application, as prohibited by NRS 686A.310(1)(g).

7.      That Defendant Hartford failed to provide a prompt reasonable explanation to Plaintiffs of their basis in the insurance policy, with respect to the facts of the Plaintiffs' claims and the applicable law, for the denial of Plaintiffs' claim or for an offer to settle or compromise Plaintiff's claim, as prohibited by NRS 686A.310(1)(n).

8.      That Defendant Hartford failed to adopt and implement reasonable claims arising under the insurance policy, as prohibited by NRS 686A.310(1)(c).

9.      Pursuant to NRS 686.310A(2), Defendant Hartford is liable for any damages sustained by Plaintiffs as a result of its violation of the above unfair claims practices, including damages for benefits denied under the insurance policy, consequential damages, emotional distress, and attorney's fees. Furthermore, Plaintiffs are entitled to punitive damages as the above violations were done with a conscious disregard for the rights of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs reserving their right as individuals or through their representatives, to amend their Complaint prior to, or at the time of trial of this action to insert those items of damage not yet fully ascertainable, pray for judgment against said Defendants, and each of them as follows:

## FIRST CLAIM FOR RELIEF

1)  For Contractual, General and Special Damages in a sum in excess of $15,000.00 subject to proof at trial;

2)  For Attorneys' fees and costs of suit incurred herein;

3)  For interest at the statutory rate; and

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280

4) For such other and further relief as the Court may deem just and equitable in the matter.

## SECOND CLAIM FOR RELIEF

1) For Contractual, General, Special and Punitive Damages in a sum in excess of $15,000.00 subject to proof at trial;

2) For Attorneys' fees and costs of suit incurred herein;

3) For interest at the statutory rate; and

4) For such other and further relief as the Court may deem just and equitable in the matter.

## THIRD CLAIM FOR RELIEF

1) For Contractual, General, Special and Punitive Damages in a sum in excess of $15,000.00 subject to proof at trial;

2) For Attorneys' fees and costs of suit incurred herein;

3) For interest at the statutory rate; and

4) For such other and further relief as this Court may deem fit.

5)

## FOURTH CLAIM FOR RELIEF

1) For Contractual, General, Special and Punitive Damages in a sum in excess of $15,000.00 subject to proof at trial;

2) For Punitive Damages against Defendants in a sum sufficient to deter such conduct by the Defendants in the future;

3) For Attorneys' fees and costs of suit incurred herein;

4) For interest at the statutory rate; and

///

///

///

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280

5) For such other and further relief as the Court may deem just and equitable in the matter.

DATED this _____ day of April, 2017.

BERNSTEIN & POISSON

CHRISTOPHER BURK, ESQ.
Nevada Bar #8976
Attorney for Plaintiff

Electronically Filed
04/17/2017 04:49:11 PM

**DMJT**
Scott L. Poisson, Esq.
Nevada Bar No. 10188
Christopher D. Burk, Esq.
Nevada Bar No. 8976
**BERNSTEIN & POISSON**
320 S. Jones Blvd
Las Vegas, NV 89107
Telephone: (702) 256-4566
Facsimile: (702) 256-6280
Email: chris@vegashurt.com
*Attorneys for Plaintiff*

**CLERK OF THE COURT**

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

Mary Jean Lambert,

        Plaintiff,

vs.

Hartford Underwriters Insurance Company an entity licensed to do business in Arizona and Nevada; DOES 1 through 10; XYZ CORPORATIONS 11 through 20; and ABC LIMITED LIABILITY COMPANIES 21 through 30, inclusive,

        Defendants.

CASE NO.: A-17-754121-C
DEPT NO.: XIV

**DEMAND FOR JURY TRIAL**

    Plaintiff's by and through her attorneys of record, SCOTT L. POISSON, ESQ., and

CHRISTOPHER D. BURK, ESQ of the law offices of BERNSTEIN & POISSON, hereby

**DEMANDS A TRIAL BY JURY.**

/ / /

/ / /

/ / /

/ / /

/ / /

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566 FAX: (702) 256-6280

This matter is filed for all issues so triable pursuant to Nevada Rules of Civil Procedure, Rule 38 *et. seq.*

DATED this _____ day of April, 2017.

Respectfully submitted,

**BERNSTEIN & POISSON**

_____
SCOTT L. POISSON, ESQ.
NV State Bar No. 010188
CHRISTOPHER D. BURK, ESQ.
NV State Bar No. 8976
*Attorneys for Plaintiffs*

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566 FAX: (702) 256-6280

Electronically Filed
04/17/2017 04:48:38 PM

**CLERK OF THE COURT**

**IAFD**
Scott L. Poisson, Esq.
Nevada Bar No. 10188
Christopher D. Burk, Esq.
Nevada Bar No. 8976
**BERNSTEIN & POISSON**
320 S. Jones Blvd
Las Vegas, NV 89107
Telephone: (702) 256-4566
Facsimile: (702) 256-6280
Email: chris@vegashurt.com
*Attorneys for Plaintiff*

# DISTRICT COURT

## CLARK COUNTY, NEVADA

Mary Jean Lambert,

   Plaintiff,

vs.

Hartford Underwriters Insurance Company an entity licensed to do business in Arizona and Nevada; DOES 1 through 10; XYZ CORPORATIONS 11 through 20; and ABC LIMITED LIABILITY COMPANIES 21 through 30, inclusive,

   Defendants.

CASE NO.: A-17-754121-C
DEPT NO.: XIV

## INITIAL APPEARANCE AND FEE DISCLOSURE

  Plaintiff's, by and through her attorneys of record, SCOTT L. POISSON, ESQ. and CHRISTOPHER D. BURK, ESQ. of the law offices of **BERNSTEIN & POISSON**, hereby submits their Initial Appearance and Fee Disclosures in the above-captioned matter, pursuant to NRS Chapter 19, as amended by Senate Bill 106. Filing fees are indicated below:

/ / /

/ / /

/ / /

/ / /

/ / /

Bernstein & Poisson
320 S. Jones Blvd
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566 FAX: (702) 256-6280

1.   Plaintiff Mary Jean Lambert   : $270.00

DATED this _____ day of April, 2017.

Respectfully submitted,

BERNSTEIN & POISSON

_____
SCOTT L. POISSON, ESQ.
NV State Bar No. 010188
CHRISTOPHER D. BURK, ESQ.
NV State Bar No. 8976
*Attorneys for Plaintiff*

Bernstein & Poisson
320 S. Jones Blvd.
Las Vegas, Nevada 89107
OFFICE: (702) 256-4566  FAX: (702) 256-6280